[No. E012534. Fourth Dist., Div. Two. Dec. 14, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID SCOTT CURTIS, Defendant and Appellant.

**[Opinion certified for partial publication.]***

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts VI, VII, and VIII.

1338

## COUNSEL

Jeffrey J. Stuetz, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Douglas P. Danzig, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

RAMIREZ, P. J.—Defendant David Scott Curtis (defendant) had an affair with a married woman, Abigail Camacho Medina (Abby).[1] This brought him into conflict—sometimes violent conflict—with Abby's husband, brother, and other members of her family.

Defendant's relationship with Abby herself was not free from conflict. They broke up and got back together many times. Abby gave birth to a child, Nicole. At one point, she told defendant he was Nicole's father; later, however, she denied this. Defendant filed suit for visitation rights.

One day, defendant stole Abby's car. According to him, he hoped that in exchange for the return of her car, she would help him to prove that it was her husband who had committed a previous theft of his truck. At defendant's request, Abby came to his apartment; her brother and her uncle came with her, but they waited outside. Abby also brought a tape recorder, concealed in her purse, in case defendant confessed to stealing her car.

---

[1] The dramatis personae will include various family members who share the same last names. For the sake of clarity, we refer to such persons by their first names.

They argued at length. Abby's brother became concerned because she was taking so long; he knocked on defendant's door. Moments later, defendant shot Abby and killed her. Both the argument and the shooting were tape-recorded.

Defendant claimed to have thought that Abby's brother, and perhaps others, were about to break down his door and attack him. He got out his rifle to defend himself, he claimed, but it went off and struck Abby by accident.

Defendant was convicted of second degree murder. On appeal, he contends:

1. The jury instruction on implied malice erroneously failed to require both a "base, antisocial motive" and a "high probability" of death.

2. The trial court's refusal to instruct on self-defense and defense of habitation was error because the fact that defendant was acting in either self-defense or defense of habitation tended to disprove implied malice.

3. The trial court's refusal to instruct on imperfect self-defense was error, because there was evidence to support this defense, or alternatively, because the fact that defendant was acting out of a good faith belief in the necessity for self-defense tended to disprove implied malice.

4. The trial court, having instructed that the homicide was excusable if committed by accident "during the performance of a lawful act by lawful means," but involuntary manslaughter if committed while defendant was unlawfully brandishing a firearm, and having further instructed that it was not unlawful to brandish a firearm in self-defense, erroneously refused to instruct on self-defense.

5. The instruction on "heat of passion" erroneously failed to define "passion."

6. The trial court erroneously failed to instruct sua sponte that a "heat of passion" may result from a series of events over time.

7. CALJIC No. 2.90, which the trial court used to instruct on reasonable doubt, is unconstitutional.

We find no error, and we affirm.

## I.

### PROCEDURAL BACKGROUND

On September 25, 1991, defendant was charged by information with one count of murder (Pen. Code, § 187). It was specially alleged for sentence enhancement purposes that defendant personally used a firearm in the commission of the charged offense (Pen. Code, § 12022.5).

Jury trial began on February 1, 1993. On February 22, 1993, the jury found defendant guilty of second degree murder; it found the firearm use allegation true. On March 22, 1993, defendant was sentenced to prison for an indeterminate term of 15 years to life on the murder conviction, plus a determinate term of 4 years (the midterm) on the firearm use finding, to be served consecutively.

## II.

### FACTUAL BACKGROUND

Defendant first met Abby at the K-Mart in Moreno Valley, where they both worked. Around January 1990, defendant began dating Abby, although she was married to Roberto "Angel" Medina (Roberto) at the time. Abby's mother, Gloria Camacho (Gloria), did not approve of her relationship with defendant. In February and again in March 1990, Gloria told defendant to leave Abby alone.

By March 1990, Abby was pregnant. In late March, her husband, Roberto, went to New Jersey. Abby moved in with her mother, Gloria, and her uncle, Hiram Negron Martinez (Hiram). In June 1990, Roberto returned. Abby, however, stayed at her mother's house for the duration of her pregnancy.

In June and July 1990, defendant drove past the family's house up to 3 times a day;[2] he phoned as many as 10 or 12 times a day, sometimes in the middle of the night. These calls continued until Abby's mother Gloria had the phone number changed.

Abby's brother Bernardo "Tito" Camacho (Bernardo) went to the K-Mart where defendant worked at least three times to tell defendant to leave the family alone. He indicated that the family had either "connections" or "muscle," and that "if [defendant] didn't cut it out, [Bernardo was] going to beat him up."

---

[2]Defendant admitted driving by the family's house once or twice a week "to bug them," claiming they would sit in front of the K-Mart to "bug [him]."

One day, Bernardo was at the K-Mart when he happened to see defendant talking on a pay phone. Bernardo called the family home, where his mother Gloria said she had just gotten off the phone with defendant. Bernardo then confronted defendant and threatened to "fuck him up" if he "kept messing around" with Gloria. Another time, because defendant had been "messing with the distributor cap" of Abby's car, Bernardo went to the K-Mart and told defendant to leave Abby's car alone and to leave the family alone.

In September 1990, Abby went with her husband Roberto and her mother Gloria to a movie theater near the K-Mart. When they came out, defendant was waiting for them. He challenged Abby's husband to a fight. Defendant said, "I fucked your wife and I could fuck her any time I want to." He added, "That's my baby. That's not your baby." Abby's mother hit defendant with her purse. Defendant started to fight with Abby's husband, but some by-standers separated them.

In October 1990, Abby went again with Roberto and Gloria to the same movie theater. They were looking for a place to park when they realized defendant was following them in his truck. They drove away through the parking lot, but defendant kept following them, a scant two feet behind their car. They stopped; defendant drove by and yelled "faggot" at Roberto and "bitch" at Gloria. Defendant rammed his truck into Abby's car, once[3] and then a second time, then sped away. When Abby's brother Bernardo heard about this, he and a friend went to the K-Mart and again told defendant to leave the family alone.

Abby's baby, a girl named Nicole, was born on November 17, 1990. Defendant filed suit to establish visitation rights. After Thanksgiving, Abby moved from her family's house to an apartment.

On April 25, 1991, defendant stole Abby's car. Abby suspected defendant was the thief. Later that day, defendant phoned and said he wanted Abby to come alone to his apartment at 8:30 p.m. to talk about her car.

Abby was afraid defendant would "g[e]t rough with her" or kidnap her. Abby and her family decided that Abby would drive to defendant's apartment in her friend Irma's car, while Irma, with Abby's brother Bernardo and her uncle Hiram, followed in a second car. Abby was going to try to get defendant to admit he had stolen her car. She carried a voice-activated tape recorder in her purse to record his confession. If she succeeded, she was to call her mother Gloria and use the code word, "Pampers."

---

[3] Abby's mother Gloria testified that Abby was standing in front of the car and had to jump out of the way to avoid being hit. Defendant and an unrelated bystander, however, testified that Abby was still in the car at the time.

About 9 p.m., Abby arrived at defendant's apartment. Bernardo and the others parked across the street and waited. Defendant let Abby in. Their subsequent conversation was picked up, albeit imperfectly, by Abby's tape recorder.

When Abby entered, defendant said, "Who's your friend?" She feigned ignorance, asking, "What friend?" Shortly thereafter, she said, "I wish you would put that down, okay." Defendant later admitted that this referred to a rifle he was holding. Abby repeatedly accused defendant of stealing her car. Defendant, in turn, accused Abby's husband of stealing his truck, and added that Abby had stolen his baby. He asked her why she never let him see Nicole. Abby responded that she had lied when she told defendant Nicole was his baby. Several times, she said she loved her husband and did not love defendant. "If I wanted to destroy you," Abby said, "I could destroy you. I mean you could lose your job." "I'm destroyed already," defendant responded, "[b]ecause of you." He added that he was going to quit his job. Later, defendant asked, "Why did you hurt me[,] Abby?," and said, "I'm mad at you."

After a while, defendant said a friend of his knew where Abby's car was. Abby pressed defendant to call his "friend" and retrieve her car. Suddenly, defendant said, "Let go, let go." There was a loud "pop," and Abby screamed, "Owww." Defendant later testified that at this point he and Abby were struggling for possession of a baseball bat, and the bat hit Abby in the head. Defendant warned Abby to "be quiet, or I'll fuck you up . . . don't move." Abby, however, continued to scream and cry. Most of the rest of their conversation is unintelligible.

Meanwhile, Abby's brother Bernardo, who had been waiting with the others for about 45 minutes, was getting impatient. He phoned Gloria, who told him Abby had called, given the "Pampers" signal, and said she would be home in 15 minutes.[4] However, she said, that had been 25 minutes ago. Bernardo phoned defendant, but his line was busy. After waiting about 15 more minutes, Bernardo and Hiram went to defendant's door and knocked.

The tape then recorded the following:

"[Defendant]: Who is it?

"[Bernardo]: It's Abby's brother.

"[Defendant]: Wha' da ya want?

---

[4] This telephone call does not appear in the transcript of the tape recording, but could have occurred during an unintelligible portion.

"[Bernardo]: I want my sister.

"[Defendant]: Come in and get her.

"[Abby]: No [pause] no [pause] no [pause] baby don't. Don't [pause] no please don't."

Bernardo and Hiram heard Abby say, in Spanish, "Tito, he has a rifle." They also heard her say, "Don't shoot me."[5] They backed away from the door, retreating at least 20 feet. Bernardo yelled to Abby's friend Irma to call 911.

Meanwhile, the tape recorded the following:

"[Defendant]: I'm calling the police right now.

"[Abby]: He won't [pause] Dave [pause] please.

"[Defendant]: What's he doing here?

"[Abby]: I don't know [pause] he must have followed me here. No[,] please [pause] baby [pause] quit it[,] baby [pause]."

Defendant asked several times, "What's he doing here?" Abby just kept repeating, "[W]ait a minute [pause] wait a minute." Defendant then said:

"[Defendant]: Be quiet [pause] do as I say [pause] don't move [pause].

"[Abby]: Okay.

"[Defendant]: [D]on't move.

"[Abby]: Okay.

"[Defendant]: Don't move.

"[Abby]: I won't move. I won't. Please don't shoot me[,] baby. Please don't [pause] honey[,] please [pause] I don't mean this. Just drop it [pause].

"[Defendant]: Police are on their way.

"[Abby]: You can't [pause] let's go Dave. Let's go. Let (unintelligible) go [pause] let's go [pause] baby.

---

[5] These words do not appear in the transcript of the tape recording; however, the transcript does indicate that Abby said something at this point which was not picked up clearly enough to be transcribed.

"[Defendant]: Hey.

"[Abby]: Please [pause] please [pause] babe [pause] please don't."

At that point, the rifle defendant was holding fired. The bullet entered Abby's left shoulder, pierced her lungs, and struck her heart, killing her. Forensic evidence indicated that Abby was close to the floor, sitting or kneeling down, when she was shot. It also indicated that after the gun went off, defendant manually ejected the spent shell and chambered a live round.

When Bernardo heard the gunshot, he ran up to the door. Defendant called · to him, "Y' comin' in?" Defendant then phoned 911. He reported that his girlfriend had been shot. "My gun went off accidentally," he explained. "I have a gun and her brother came to the door and was trying to get in. And I told him just to get back. [']Cause there's a whole bunch a shit that's been going on for a long time around here."

When police arrived, defendant said, "I shot her, man. Would you please go and help her." After defendant was arrested, Bernardo asked him, "Why[,] David?" "Was it really worth it?" Defendant answered, "Isn't this what you guys wanted?"

Defendant testified on his own behalf. He claimed that when he first slept with Abby he did not know she was married. In March or April 1990, he learned she was pregnant. She told him the baby was his.

Defendant related various incidents in which Abby's husband Roberto attacked or threatened him. First, Roberto came to the K-Mart and told defendant, "Stay away from my wife." About a week later, defendant left work and was just opening the door of his truck when someone hit him in the head from behind. Later, Abby told him it had been Roberto.[6] Another time, Roberto came by the K-Mart "ready to fight" and said "he was going to get [defendant]." Defendant believed Roberto was a gang member.

Defendant claimed the September 1990 fight at the movie theater was started by Roberto and Gloria. In the October 1990 movie theater incident, defendant admitted following Abby's car, confronting her so that she could not deny that she had been out with her husband, and calling her mother a bitch. He claimed, however, that he was driving away when Roberto chased his truck and smashed a window. Because he was trying to keep an eye on Roberto, he accidentally "scraped" Abby's car.

---

[6]Roberto admitted that when he first saw defendant, he attacked him and "[p]unched him out," apparently referring to this occurrence.

Abby's brother Bernardo threatened defendant at K-Mart three times. He told defendant "he could shoot [him] up anytime he want[ed] to." Her mother Gloria also "sw[ore] to God she [wa]s going to kill [defendant]" if he did not stop seeing Abby.

Beginning in mid-1990, defendant lived in his truck and kept virtually all of his worldly goods in it. Sometime after Nicole was born, Abby's husband Roberto spotted defendant with Abby and attacked him; a bystander broke up the fight. Defendant spent that night in a motel with Abby and Nicole. By morning, his truck had been stolen. It was later recovered, but it had been "burnt to a crisp." Defendant had reason to believe Roberto was responsible.

Defendant claimed he still had a good relationship with Abby. He continued to meet her secretly. After Abby moved out of her mother's house, however, the relationship "deteriorate[d]"; defendant still saw her about once a week, but not overnight.

By April 1991, defendant had become afraid of Abby's family. He sometimes asked coworkers at K-Mart to walk him to his car. Before defendant's truck was stolen, he kept a loaded pistol in it; he told a friend the pistol was for protection.

Defendant admitted that he stole Abby's car. He hoped that in exchange for the return of her car, she would give him information about the theft of his truck. He expected Abby's family would find out that he had stolen the car. He thought it was possible, although not likely, that as a result they would come over to his apartment and do something violent.

Defendant phoned Abby and asked her to meet him at his apartment. He told her to come alone because he was afraid of her family. When she arrived, however, he saw a second car pull up. Before he let her in, he picked up his rifle because he thought some member of her family was going to come in with her. He thought they might be armed. Even before he let Abby in, he "thought that this could turn into a deadly situation."

Abby, however, came in alone. She told him to put the rifle down. He did, but he immediately picked up a baseball bat. At one point, Abby grabbed the bat; defendant grabbed it back, and "pulled it towards the back of her head." It hit her in the head, and she screamed and fell to the floor.

There was a knock at the door. Defendant picked up the rifle and aimed it at the door. At that point, Abby was kneeling in a corner of the apartment. Her brother Bernardo identified himself and said he wanted his sister.

Defendant thought other members of Abby's family might be with Bernardo. He was afraid they were going to break in. He thought the reason they were asking him to let Abby out was so that they could come in. Defendant would have shot anyone who came in, even someone unarmed. Nevertheless, defendant told Bernardo to come in. Defendant agreed that he had "created an extremely dangerous situation."

Abby wanted to leave, but defendant refused to let her go. She moved toward the door two or three times. Defendant waved her back with the rifle. The safety was off. The hammer was cocked, a live bullet was in the chamber, and defendant's finger was on the trigger. The rifle fired. Defendant denied pulling the trigger intentionally and said he did not know how the gun went off. He also denied being angry with Abby or intending to kill her.

Defendant had given a statement to police which differed somewhat from his testimony at trial. He told them about the friction between him and Abby's family. Abby had broken up with him many times, he said, but she always called and asked to get back together with him. The night of the shooting, he and Abby were arguing over Nicole. Abby offered to give defendant visitation rights to Nicole if he would confess to stealing her car. Abby also threatened to have friends come over and "make trouble" for him, then picked up a baseball bat and swung it. They wrestled, and he claimed she hit him in the back of the head with her fist or elbow.

Defendant said that when Bernardo came to the door, he not only knocked on it, but also shook and kicked it. At that point, defendant got his rifle. He was afraid for his life, he claimed; he thought that Bernardo had come with friends, that they all had guns, and that they were going to break his door down. However, he admitted, "I [had] had it, I wanted to shoot [Bernardo]. I wanted him to break down my door." Defendant told police the rifle went off when Abby hit it.

### III.

#### THE JURY INSTRUCTION ON IMPLIED MALICE

 The trial court instructed the jury on implied malice using CALJIC No. 8.11 (5th ed. 1988), which stated that: "Malice is implied when, one, the killing resulted from an intentional act; two, the natural consequences of the act are dangerous to human life; and, three, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life." Defendant contends that this instruction was erroneous in two respects: (1) it omitted a requirement that the defendant have "a base,

antisocial motive," and (2) it omitted a requirement of a "high probability" that the defendant's act result in death.

Murder is defined as "the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187.) By statute, malice "may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.) "Th[is] statutory definition of implied malice," however, "has never proved of much assistance in defining the concept in concrete terms." (*People* v. *Dellinger* (1989) 49 Cal.3d 1212, 1217 [264 Cal.Rptr. 841, 783 P.2d 200].)

Efforts to translate this " 'amorphous anatomical characterization' " (*People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 103 [13 Cal.Rptr.2d 864, 840 P.2d 969], quoting *People* v. *Protopappas* (1988) 201 Cal.App.3d 152, 163 [246 Cal.Rptr. 915]) into workable and understandable jury instructions have given rise to two competing definitions of implied malice. (See generally, *People* v. *Nieto Benitez, supra,* 4 Cal.4th at pp. 103-104; *People* v. *Dellinger, supra,* 49 Cal.3d at p. 1218.) ■ Under what we will call the "wanton disregard" definition, malice may be implied "where 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*People* v. *Nieto Benitez, supra,* 4 Cal.4th at pp. 103-104, quoting *People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1] (conc. opn. of Traynor, J.).) Under what we will call the "conscious disregard" definition, malice may be implied where the killing was proximately caused by " ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People* v. *Nieto Benitez, supra,* 4 Cal.4th at p. 104, quoting *People* v. *Phillips* (1966) 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353].)

These two definitions have repeatedly been held to "articulate[] one and the same standard." (*People* v. *Nieto Benitez, supra,* 4 Cal.4th at p. 104; *People* v. *Dellinger, supra,* 49 Cal.3d at p. 1219; see also *People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) Nevertheless, in *People* v. *Dellinger, supra,* the Supreme Court held that "[t]he better practice" is to use the "conscious disregard" definition in jury instructions, rather than the "wanton disregard" definition. (49 Cal.3d at p. 1221.) It reasoned that the word "wanton" "is not in common use in contemporary daily speech." (*Ibid.*) It expressly approved CALJIC No. 8.11, which used the "conscious disregard" definition. (49 Cal.3d at p. 1222; accord, *People* v.

*Nieto Benitez, supra*, 4 Cal.4th at p. 104.) CALJIC No. 8.11 has not changed since *Dellinger* was decided.

 Defendant, however, contends that CALJIC No. 8.11 and the "conscious disregard" definition are defective because, unlike the "wanton disregard" definition, they fail to inform the jury that malice requires both "a base, antisocial motive" and a "high probability" that the defendant's act will result in death. As defendant notes, during its deliberations the jury asked questions about the implied malice instruction which strongly suggest that it convicted defendant of second degree murder based on implied malice rather than express malice. Defendant therefore further contends that any error in this instruction was prejudicial.

We discuss the two assertedly omitted phrases in turn.

A. *"Base, Antisocial Motive."*

The words "base, antisocial motive" in the "wanton disregard" definition have no apparent equivalent in the "conscious disregard" definition. We believe, however, that "base, antisocial motive" in this context merely means that the defendant killed without any legally recognized justification or excuse (such as self-defense). Hence, it is more like the absence of an affirmative defense than a true element of the crime.

The statutory definition of express malice requires "a deliberate intention unlawfully to take away the life of a fellow creature." (Pen. Code, § 188.) In *People* v. *Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588], the Supreme Court stated that: " 'The adverb "unlawfully" in the express malice definition means simply that there is no justification, excuse, or mitigation for the killing recognized by law.' " (*Id.*, at p. 1115, quoting *People* v. *Bobo* (1990) 229 Cal.App.3d 1417, 1440-1441 [3 Cal.Rptr.2d 747]; see also *People* v. *Frye* (1992) 7 Cal.App.4th 1148, 1155 [10 Cal.Rptr.2d 217].)

Recently, in *In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574], the court held that imperfect self-defense rebuts the intent to kill "unlawfully" within the meaning of the express malice definition. (*Id.*, at pp. 778-780.) In an instructive footnote, the court held that imperfect self-defense also rebuts implied malice. It explained that "implied malice is shown when 'the defendant *for a base, antisocial motive* and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' . . . A defendant who acts with the requisite actual belief in the necessity for self-defense does not act with the

base motive required for implied malice, i.e., with 'an abandoned and malignant heart.' " (*Id.*, at p. 780, fn. 4, original italics, quoting *People* v. *Thomas, supra,* 41 Cal.2d at p. 480 (conc. opn. of Traynor, J.).)

We conclude that both "unlawfully" in the definition of express malice and "for a base, antisocial motive" in the "wanton disregard" definition of implied malice mean the same thing: the absence of any justification, excuse, or mitigation recognized by law. ■ In one sense, justification and excuse are affirmative defenses, in that the defendant has the burden of raising them. In another sense, however, their absence is an element of the crime, in that, provided there is at least some evidence of justification or excuse, the People bear the ultimate burden of persuasion on the issue. (*People* v. *Frye, supra,* 7 Cal.App.4th at pp. 1154-1155; see also *People* v. *Wickersham* (1982) 32 Cal.3d 307, 328-329 [185 Cal.Rptr. 436, 650 P.2d 311] [imperfect self-defense rebuts malice; however, it "comes within [the] category of 'defenses' for purposes of the obligation to instruct *sua sponte.*"].) Thus, lack of justification or excuse has been called "a negative rather than an affirmative element" of the crime. (*People* v. *Frye, supra,* 7 Cal.App.4th at p. 1151.)

■ "Base, antisocial motive" therefore is an allusive and elliptical term of art for an "element" of the crime which is not an element at all unless the defendant places it in issue. The "conscious disregard" definition properly omits this confusing term. It leaves the topic of justification and excuse to be covered by other instructions, which may be given as needed in a particular case. This is just one more way in which, as the Supreme Court has held, the "conscious disregard" definition is preferable to the "wanton disregard" definition.

B. *"High Probability" That Death Will Result.*

Defendant also contends that the "conscious disregard" definition is defective because, unlike the "wanton disregard" definition, it fails to require that the defendant's act must involve a high probability of death. This contention, however, is foreclosed by the Supreme Court's repeated statements that the "conscious disregard" and "wanton disregard" definitions are equivalent to each other (*People* v. *Nieto Benitez, supra,* 4 Cal.4th at p. 104; *People* v. *Dellinger, supra,* 49 Cal.3d at p. 1219; *People* v. *Watson, supra,* 30 Cal.3d at p. 300), and its express approval of jury instructions based on the "conscious disregard" definition. (*People* v. *Nieto Benitez, supra,* 4 Cal.4th at p. 104; *People* v. *Dellinger, supra,* 49 Cal.3d at p. 1222.)

The "conscious disregard" definition requires that the "natural consequences" of the defendant's act be "dangerous to life." This is equivalent to

the requirement of the "wanton disregard" definition that the act involve a "high probability" of death. (*People* v. *Cleaves* (1991) 229 Cal.App.3d 367, 378 [280 Cal.Rptr. 146].) Thus, this court has previously rejected this same contention. (*People* v. *McCarnes* (1986) 179 Cal.App.3d 525, 530-531 [224 Cal.Rptr. 846].)

The trial court did not err in instructing the jury on implied malice using CALJIC No. 8.11 and the "conscious disregard" definition.

IV.

THE TRIAL COURT'S REFUSAL TO INSTRUCT ON IMPERFECT SELF-DEFENSE, TRADITIONAL SELF-DEFENSE, AND DEFENSE OF HABITATION

Defendant requested jury instructions on imperfect (or "unreasonable") self-defense, using CALJIC No. 5.17 (5th ed. 1988); on traditional (or "complete," or "perfect") self-defense, using CALJIC Nos. 5.30, 5.31, 5.50, and 5.51 (5th ed. 1988); and on defense of habitation, using CALJIC Nos. 5.40 and 5.42 (5th ed. 1988). The trial court stated, "I have the greatest problem with whether [imperfect self-defense] applies or not." However, it refused to give any of defendant's requested instructions, for two reasons: first, because it was defendant's position that the rifle had gone off accidentally; and second, because: "No one was coming in. No one was breaking in the door. No one was threatening."

Defendant contends that the trial court's refusal to give these instructions was error. He contends that an instruction on imperfect self-defense was required because there was sufficient evidence of that defense. By contrast, he does not appear to contend that there was sufficient evidence of either traditional self-defense or defense of habitation, as such. Rather, he contends that instructions on each of these defenses, as well as on imperfect self-defense, were necessary to assist the jury in determining whether he harbored implied malice.

A. *Imperfect Self-defense.*

Imperfect self-defense applies where the defendant actually believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and actually believes the acts which cause the victim's death are necessary to avert the threat, but these beliefs are objectively unreasonable. (*People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1186 [264 Cal.Rptr. 167].) Imperfect self-defense is not a complete defense to homicide. However, it negates malice aforethought and thereby reduces a homicide which would

otherwise be murder to voluntary manslaughter. (*Ibid.*; see generally, *In re Christian S.*, *supra*, 7 Cal.4th 768, 773; *People* v. *Flannel* (1979) 25 Cal.3d 668, 674-680 [160 Cal.Rptr. 84, 603 P.2d 1].)

A trial court has no duty to instruct the jury on a defense—even at the defendant's request—unless the defense is supported by substantial evidence. (*People* v. *Flannel, supra,* 25 Cal.3d at pp. 684-685; *People* v. *Aris, supra*, 215 Cal.App.3d at p. 1192.) The People argue that an instruction on imperfect self-defense was unnecessary because there was no evidence that defendant actually believed he was in imminent danger. Although we, too, question whether there was sufficient evidence that defendant had such an actual belief, we assume, without deciding, that there was.

We find imperfect self-defense inapplicable for a different reason. Imperfect self-defense has been held to apply only to a volitional shooting, not an accidental one. (*People* v. *Wickersham, supra,* 32 Cal.3d at p. 328.) In *Wickersham,* the defendant was accused of murdering her estranged husband. She denied shooting him intentionally; she claimed that in a scuffle for possession of the gun, it just went off. (*Id.,* at p. 322.) On appeal, the defendant argued that the trial court had a duty to instruct on unreasonable self-defense.

The Supreme Court found evidence that the defendant "honestly believed that her life was in danger and . . . acted in accordance with that belief." (32 Cal.3d at p. 328.) The court observed, however, that imperfect self-defense was inconsistent with the defendant's testimony because it "is premised on an intentional killing, whereas appellant testified that the gun went off by accident in the midst of the struggle." (*Ibid.*) It nevertheless found that the jury could have believed defendant's testimony that she was in fear of death yet disbelieved her testimony that she did not fire the gun intentionally. Thus, the jury could have found "that in fact [she] pulled the trigger out of fear." (*Ibid.*) For this reason, "the evidence was sufficient to justify a finding of unreasonable self-defense and the trial court would have erred had it denied a request for instructions on this theory." (*Ibid.*)[7] The court held, however, that because imperfect self-defense was inconsistent with the defendant's claim that the shooting was accidental, the trial court had no

---

[7]Similarly, in *People* v. *Mayweather* (1968) 259 Cal.App.2d 752 [66 Cal.Rptr. 547], the defendant testified that during a fight, he grabbed for a gun on the floor to keep his opponent from getting it; it went off accidentally, killing his opponent. (*Id.,* at p. 755.) The court noted that "a finding of self-defense, which imports a volitional shooting, is inconsistent with defendant's own testimony. On the other hand, the People went to some trouble to prove by expert testimony that the gun in question would not accidentally discharge as claimed by defendant. Under the circumstances the jury could have found that for various reasons defendant's recollection was not correct." (*Id.,* at p. 756.) It held that because the jury could

duty to instruct on imperfect self-defense in the absence of a request. (*Id.*, at p. 329.)

Here, as in *Wickersham*, imperfect self-defense is inconsistent with defendant's testimony that the gun went off accidentally. In *Wickersham*, however, the jury could have rejected the defendant's testimony and concluded that the defendant fired intentionally, and hence that imperfect self-defense applied. We do not believe that is the case here. Defendant was not aiming at Bernardo, his perceived assailant; his shot struck Abby, then ricocheted off the floor and came to rest inside the apartment in the track of a sliding closet door. There was no evidence that defendant perceived Abby as a threat. Although there was evidence that he did not want her to leave because he thought that if she left, Bernardo would come in, there was no evidence that she was trying to leave when she was shot. To the contrary, she was sitting or kneeling on the floor at the time. Thus, if defendant fired intentionally, he did not do so out of a belief that he was acting in self-defense. Imperfect self-defense did not apply.

Accordingly, defendant focuses not so much on whether he fired the fatal shot in self-defense, but rather on whether he performed the acts which led up to the shooting—such as arming himself with a cocked, loaded rifle—in self-defense. Defendant argues that even if imperfect self-defense did not apply to the shooting, the jury should have been instructed on the doctrine because the fact that he armed himself in self-defense, even if unreasonably, would negate implied malice.

We disagree. Imperfect self-defense rebuts malice only where all its prerequisites are met. The defendant's belief in the need for self-defense is not enough. In *Wickersham, supra*, the Supreme Court recognized that " '[a]n honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought . . . .' " (32 Cal.3d at p. 328, quoting *People* v. *Flannel, supra*, 25 Cal.3d at p. 674.) It found evidence that the defendant was acting in accordance with an actual belief that her life was in danger. Nevertheless, it indicated that she could not claim imperfect self-defense if she fired unintentionally. (32 Cal.3d at p. 328.) This necessarily implies that a defendant's bare belief in the need for self-defense is insufficient to negate malice.

Similarly, in *In re Christian S.*, the Supreme Court cautioned that: "It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be

---

have found that the shooting was intentional, the trial court should have instructed the jury on self-defense. (*Ibid.*)

invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction if the felon killed his pursuer with an actual belief in the need for self-defense." (*In re Christian S., supra,* 7 Cal.4th at p. 779, fn. 1.) "Nor," it added, "do we suggest that malice would be negated by a mistake of law, for example, if a defendant killed with the mistaken belief that he could properly use deadly force to protect his parked automobile against a vandal." (*Id.,* at p. 775, fn. 3.)

In *Wickersham,* there was evidence that the defendant performed the acts leading up to the fatal shot out of an honest but unreasonable belief that they were necessary in self-defense. The Supreme Court nevertheless indicated that if the evidence had shown that the gun went off accidentally, the trial court would not have been required to give an imperfect self-defense instruction. (32 Cal.3d at p. 328.) Here, defendant either shot Abby intentionally and not in self-defense, as the prosecution argued, or unintentionally, as he testified. Under these circumstances, *Wickersham* teaches us, an imperfect self-defense instruction simply is not required.

B. *Traditional Self-defense.*

Traditional self-defense applies where the defendant believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and believes the acts which cause the victim's death are necessary to avert the threat, and these beliefs are objectively reasonable. (*People* v. *Aris, supra,* 215 Cal.App.3d at p. 1186.) In the usual case, the defendant injures or kills the person who poses the threat. However, under the doctrine of transferred intent, self-defense may also apply where the defendant intends to injure or kill the person who poses the threat, but inadvertently kills an innocent bystander instead. (*People* v. *Mathews* (1979) 91 Cal.App.3d 1018, 1023-1024 [154 Cal.Rptr. 628].)

Defendant, of course, did not claim that he intended to shoot Bernardo but missed and shot Abby instead. Rather, he denied intending to shoot anybody. He claimed the rifle went off accidentally. Like imperfect self-defense, traditional self-defense imports an intentional shooting; it does not apply to an accidental one. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 718 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People* v. *Flannel, supra,* 25 Cal.3d 668, 684-685, fn. 12; *People* v. *Manning* (1905)

146 Cal. 100, 104-105 [79 P. 856]; *People* v. *McCoy* (1984) 150 Cal.App.3d 705, 708-709 [198 Cal.Rptr. 94]; *People* v. *Mayweather, supra,* 259 Cal.App.2d at p. 756; *People* v. *Corlett* (1944) 67 Cal.App.2d 33, 54 [153 P.2d 595], disapproved on other grounds in *People* v. *Carmen* (1951) 36 Cal.2d 768, 775-776 [228 P.2d 281].) Defendant's testimony that the murder weapon went off by accident is inconsistent with self-defense; it is evidence of either involuntary manslaughter (Pen. Code, § 192, subd. (b)) or excusable homicide by accident or misfortune (Pen. Code, § 195). (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 718; *People* v. *Corlett, supra,* 67 Cal.App.2d at p. 54.)

Accordingly, defendant does not argue that there was evidence of traditional self-defense, as such. Rather, he argues that there was evidence that the homicide occurred by accident while he was *armed* in traditional self-defense. In some jurisdictions, this claim would invoke the hybrid defense of accidental homicide in the exercise of self-defense. (*Koritta* v. *State* (1994) 263 Ga. 703, 703-705 [438 S.E.2d 68, 68-70]; *Gunn* v. *State* (1977) 174 Ind.App. 26, 29-33 [365 N.E.2d 1234, 1237-1239].) The defendant would be entitled to jury instructions on both self-defense and accident. (*Koritta* v. *State, supra,* 263 Ga. at p. 704 [438 S.E.2d at p. 69].) Under the law of these jurisdictions, however, it appears that self-defense does not require the intentional use of deadly force. (*Koritta* v. *State, supra,* 263 Ga. at p. 704 [438 S.E.2d at p. 69] [although "accident and self-defense generally are not involved in the same case, . . . both are present where one who is armed with a weapon claims it accidentally discharged while he was defending himself from another party"]; *Gunn* v. *State, supra,* 174 Ind.App. at p. 31 [365 N.E.2d at p. 1238] [". . . the theory of self-defense itself embraces intentional as well as accidental killings"].)

By contrast, in jurisdictions which—like California—hold that self-defense and accidental homicide are mutually exclusive, a defendant who claims to have killed by accident while defending him or herself is not thereby entitled to jury instructions on self-defense. (*State* v. *Peal* (Mo. 1971) 463 S.W.2d 840, 842; *State* v. *Barnd* (1993) 85 Ohio App.3d 254, 259-260 [619 N.E.2d 518, 521].)

Defendant therefore contends that the jury should have been instructed on traditional self-defense because the fact that he was lawfully armed in self-defense would negate implied malice. After all, defendant argues, in most (if not all) instances of self-defense, the defendant acts in a manner dangerous to life, with conscious disregard of the danger; absent a self-defense instruction, a jury could find this to be implied malice.

We are unaware of any case holding that traditional self-defense negates implied malice. However, as we noted in part IV.A., *ante,* the Supreme

Court has held that imperfect self-defense—in which the defendant actually but unreasonably believes he or she is in imminent danger of death or great bodily injury—negates both express and implied malice. (*In re Christian S., supra,* 7 Cal.4th at pp. 773, 778-780; *People v. Flannel, supra,* 25 Cal.3d at p. 679.) It would seem to follow that traditional self-defense, in which the defendant actually *and* reasonably believes he or she is in imminent danger, also negates malice. This would also follow from the principle, discussed in part III, *ante,* that one element of malice is the absence of any legally recognized justification or excuse.

Conversely, however, malice cannot be negated by a justification or excuse that is not legally recognized. As discussed in part IV.A., *ante,* imperfect self-defense rebuts malice only where all the prerequisites for invoking the defense are present, including the intentional use of deadly force. We believe this is equally true of traditional self-defense. The mere fact that defendant's conduct up until the shooting was lawful does not negate implied malice. (*People v. Contreras* (1994) 26 Cal.App.4th 944, 954 [31 Cal.Rptr.2d 757].) Thus, defendant's claim that the rifle went off accidentally bars him from relying on traditional self-defense not only as a defense, but also to negate implied malice.

Moreover, even assuming that the fact that defendant was lawfully armed in traditional self-defense would negate malice, there was no evidence that any of defendant's acts were lawful as a matter of traditional self-defense. We assumed in part IV.A., *ante,* that there was substantial evidence that defendant did actually believe he was facing an imminent threat of death or great bodily injury, and did actually believe that the acts which resulted in Abby's death were necessary to avert the threat. The trial court, however, correctly found no substantial evidence that defendant's beliefs were reasonable.

Bernardo was not trying to break into defendant's apartment, and he gave defendant no reason to think he was. When the police first interviewed defendant, he told them Bernardo was shaking the door and kicking it; at trial, however, he admitted that this was untrue, and that Bernardo had "only knocked one time." After Abby yelled, "Tito, he has a rifle," Bernardo and Abby's uncle Hiram retreated at least 20 feet away from defendant's door.

True, there was ample evidence that Bernardo and other members of Abby's family had threatened to do violence to defendant. " '[P]revious threats alone, however, unless coupled at the time with an apparent design then and there to carry them into effect, will not justify a deadly assault . . . .' " (*People v. Aris, supra,* 215 Cal.App.3d at p. 1188, quoting *People*

v. *Scoggins* (1869) 37 Cal. 676, 683; see also *People* v. *Duchon* (1958) 165 Cal.App.2d 690, 693 [332 P.2d 373] ["There can be no reasonable ground for apprehending harm in the absence of some overt act or physical demonstration."]; *People* v. *Lucas* (1958) 160 Cal.App.2d 305, 310 [324 P.2d 933] [". . . threats alone, unaccompanied by some act which induces in defendant a reasonable belief that bodily injury is about to be inflicted, do not justify a homicide."])

Because there was no evidence that Bernardo did anything that would have led a reasonable person in defendant's position to believe he was facing an imminent threat of bodily injury, the trial court had no duty to instruct the jury on traditional self-defense.

### C. *Defense of Habitation.*

■ Defense of habitation applies where the defendant uses reasonable force to exclude someone he or she reasonably believes is trespassing in, or about to trespass in, his or her home. However, the intentional use of deadly force merely to protect property is never reasonable. Accordingly, a homicide involving the *intentional* use of deadly force can never be justified by defense of habitation alone. The defendant must also show either self-defense or defense of others, i.e., that he or she reasonably believed the intruder intended to kill or inflict serious injury on someone in the home. (*People* v. *Smith* (1967) 249 Cal.App.2d 395, 402 [57 Cal.Rptr. 508]; *People* v. *Hubbard* (1923) 64 Cal.App. 27, 35 [220 P. 315]; Pen. Code, §§ 197, subd. 2, 198; see also *People* v. *Ceballos* (1974) 12 Cal.3d 470, 477-483 [116 Cal.Rptr. 233, 526 P.2d 241].)

A few older cases suggest, however, that a homicide involving the *unintentional* and accidental use of deadly force may be justified on the ground that it occurred while the defendant was exercising the right of defense of habitation. If so, defense of habitation, unlike self-defense, is not inconsistent with an accidental shooting. For example, in *People* v. *Hubbard, supra,* the defendant got into an argument with a visitor to his house, one Dennis Cope. The defendant told Cope to get out; Cope refused. The defendant picked up a gun, showed it to Cope, and again told him to get out. Cope again refused. Cope shoved the defendant; when the defendant shoved back, the gun went off and Cope was fatally shot. The defendant testified that he had just been bluffing. He denied firing the gun intentionally. He was convicted of second degree murder. (64 Cal.App. at pp. 29-31.)

The court held that the jury should have been instructed on defense of habitation. (64 Cal.App. at p. 33.) It explained: "[W]hether the killing,

assuming it to have been accidental and unintentional, was done in an attempt to perpetrate a felony, or was done in the commission of an unlawful act not amounting to a felony but which in its consequences naturally tended to destroy life, or whether the circumstances showed an abandoned heart, are all questions to which a jury of laymen could not be expected to give correct answers unless they were given some instruction respecting defendant's legal right to eject Cope from the premises and also as to what force might rightfully be used for that purpose." (*Id.*, at p. 34; see also *People* v. *Williamson* (1907) 6 Cal.App. 336, 338-339 [92 P. 313] [defendant claimed that after lodger attempted to rape her and she went with gun to order him to leave, gun went off accidentally; trial court instructed jury to acquit if defendant had a right to order lodger to leave, if she armed herself in self-defense, and if gun went off accidentally; held, trial court should also have instructed on circumstances under which defendant had a right to order lodger to leave].)[8]

Like traditional self-defense, however, defense of habitation applies only if the defendant's belief that a trespass is occurring or about to occur is reasonable. (*People* v. *Corlett, supra,* 67 Cal.App.2d at pp. 51-53; see also CALJIC Nos. 5.42, 5.43 (5th ed. 1988).) ■ As we held in part IV.B., *ante,* the trial court correctly found no substantial evidence that defendant's belief that Bernardo was about to break in was reasonable. As the trial court put it, "No one was coming in. No one was breaking in the door." Penal Code section 198.5, entitled the "Home Protection Bill of Rights," "creates a rebuttable presumption that a residential occupant has a reasonable fear of death or great bodily injury when he or she uses deadly force against an unlawful and forcible intruder into the residence. [Citations.] For section 198.5 to apply, four elements must be met. There must be an unlawful and forcible entry into a residence; the entry must be by someone who is not a

---

[8]Another case defendant cites, *People* v. *Slater* (1943) 60 Cal.App.2d 358 [140 P.2d 846], contains language to the same effect, but this appears to be dictum. In *Slater,* the defendant claimed a neighbor with whom she had been feuding ran up to her apartment shaking a clenched fist, cursing her, and yelling, "I will get you out of there." She held a gun out the window to scare him away; the gun went off accidentally, killing him. The defendant was convicted of second degree murder.

The court stated that the defendant was entitled to instructions on justifiable homicide in defense of habitation and on excusable homicide by accident or mistake. (60 Cal.App.2d at pp. 367-369.) However, it went on to hold that in light of "the fact that the fatal shooting occurred during a heated verbal altercation," the evidence showed voluntary manslaughter rather than murder. (*Id.,* at p. 371.) It modified the judgment to reduce the offense to manslaughter. (*Ibid.*) This disposition drew a heated dissent. (*Id.,* at pp. 371-378 (dis. opn. of Ward, J.).)

If indeed there was so much evidence that the homicide was justifiable as defense of habitation that the trial court erred by failing to instruct on the subject, it is hard to understand why the court let the defendant go to prison for manslaughter without a new trial before a properly instructed jury.

member of the family or the household; the residential occupant must have used 'deadly' force (as defined in § 198.5) against the victim within the residence; and finally, the residential occupant must have had knowledge of the unlawful and forcible entry." (*People* v. *Brown* (1992) 6 Cal.App.4th 1489, 1494-1495 [8 Cal.Rptr.2d 513]; see generally, *People* v. *Owen* (1991) 226 Cal.App.3d 996, 1004-1007 [277 Cal.Rptr. 341].) Defendant, however, is not entitled to the benefit of this presumption because there was no actual entry. Because there was no evidence that a reasonable person in defendant's position would have believed Bernardo was about to break in, the trial court had no duty to instruct on defense of habitation.

V.

### THE TRIAL COURT'S FAILURE TO INSTRUCT ON SELF-DEFENSE AS A DEFENSE TO BRANDISHING

Defendant requested jury instructions on excusable homicide, using CALJIC No. 5.00, on the misdemeanor-manslaughter rule, using CALJIC No. 8.45, and on the misdemeanor of brandishing a firearm (Pen. Code, § 417, subd. (a)), using CALJIC No. 16.290. The trial court gave these instructions.

The excusable homicide instruction stated that a homicide would be excusable if committed, unintentionally and nonnegligently, "in the performance of a lawful act by lawful means." The misdemeanor-manslaughter instruction advised the jury that if the homicide occurred during the commission of the misdemeanor of brandishing a firearm, it would be involuntary manslaughter. Finally, the brandishing instruction indicated that it would be lawful and not a misdemeanor to brandish a firearm "in self-defense." As noted in part IV, *ante*, the trial court refused defendant's request to instruct on self-defense.

Defendant contends that the trial court had a sua sponte duty to instruct on self-defense so the jury could evaluate whether his brandishing was lawful. This argument makes some sense. We have not found any California case squarely on point. Cases from other jurisdictions, however, hold that when the defendant claims to have killed by accident while engaged in acts of self-defense, the trial court should instruct on self-defense as well as on excusable homicide by accident so the jury can properly evaluate whether the defendant's acts were lawful or unlawful, and hence whether the killing was excusable homicide or manslaughter. (E.g., *Stout* v. *State* (1968) 244 Ark. 676, 681-682 [426 S.W.2d 800, 803]; *Jabich* v. *People* (1914) 58 Colo. 175, 178-181 [143 P. 1092, 1093-1094]; *State* v. *Sprague*

(Me. 1978) 394 A.2d 253, 258-259; *Commonwealth* v. *Turner* (1987) 24 Mass.App. 902, 903-904 [506 N.E.2d 151, 153], review den. (1988) 403 Mass. 1103 [529 N.E.2d 1345]; *State* v. *Leos* (1971) 7 Ore.App. 211, 216-218 [490 P.2d 521, 523-524]; *Valentine* v. *Commonwealth* (1948) 187 Va. 946, 951-955 [48 S.E.2d 264, 267-269]; *State* v. *Cobb* (1980) 166 W.Va. 65, 69-71 [272 S.E.2d 467, 470-471].)

The People therefore respond that there was no evidence that self-defense applied to defendant's brandishing of the rifle.

We agree, for the different reasons we have already discussed in connection with traditional self-defense in part IV.B., and in connection with defense of habitation in part IV.C., *ante.* Defendant's claimed belief that Bernardo was about to break in and attack him was unreasonable. All Bernardo did was knock on the door, once. Even given defendant's history of conflict with Abby's family, this was insufficient to cause a reasonable person in defendant's position to believe an unlawful attack was imminent. Thus, the trial court was not required to instruct on self-defense as a basis for concluding either that defendant's brandishing was lawful or that the resulting homicide was excusable.

However, even if we were to assume that the asserted failure to instruct was error, we would hold the error harmless under any standard. The prosecutor argued in closing: "This is not a self-defense case. You will not even be given an instruction by the court as to what constitutes self-defense." Defendant contends that the asserted error, together with the prosecutor's argument, "amounted to a directed verdict" that defendant was engaged in unlawful brandishing and hence that the homicide was not excusable.

The problem with this argument is that the jury found defendant guilty of second degree murder, not the lesser offense of involuntary manslaughter. Thus, it implicitly but necessarily found that he acted with malice aforethought. As we discussed in part IV, *ante,* defendant's claim that he was armed in self-defense when the rifle went off accidentally had no bearing on the existence of malice. Thus, the jury's malice finding was not affected by the claimed instructional error. Moreover, the malice finding (i.e., that defendant committed the homicide either intentionally or with conscious disregard of a life-threatening risk created by his actions) necessarily eliminated any possibility that the homicide was excusable (i.e., that defendant "acted with that care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances"; CALJIC No. 5.00 (5th ed. 1988)). The asserted misinstruction therefore related solely to

whether the homicide was involuntary manslaughter rather than excusable. Because the jury convicted defendant of second degree murder, it never reached the issue of defendant's guilt of this lesser offense.

We are familiar with the principle that an instruction which erroneously removes a lesser offense from the jury's consideration is deemed prejudicial because it puts the jury to an "all or nothing" choice between conviction of the greater offense and a complete acquittal. (*People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351-352 [216 Cal.Rptr. 455, 702 P.2d 613]; *People* v. *Geiger* (1984) 35 Cal.3d 510, 518-524, 526 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]; *People* v. *Wickersham*, *supra*, 32 Cal.3d at p. 324.) Here, however, defendant does not claim that the error removed involuntary manslaughter from the jury's consideration, or even that it made the jury less likely to convict him of involuntary manslaughter. To the contrary, he argues that the error prevented the jury from finding that the brandishing was in self-defense, and thus made it *more* likely to convict him of involuntary manslaughter. Under these circumstances, the fact that the jury convicted defendant of second degree murder demonstrates beyond a reasonable doubt that the claimed error did not affect the verdict.

## VI.-VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## IX.

### DISPOSITION

The judgment is affirmed.

Hollenhorst J., and McKinster, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 23, 1995.

---

*See footnote, *ante*, page 1337.