[No. F017415. Fifth Dist. Nov. 30, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIO LOPEZ, Defendant and Appellant.

COUNSEL

Veronica Bonetti, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry and Robert P. Whitlock, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

STONE (W. A.), Acting P. J.—A jury convicted appellant, Mario Lopez, on one count each of attempted voluntary manslaughter (Pen. Code, §§ 664/192, subd. (a)),[1] a lesser included offense of attempted murder (§§ 664/187, subd. (a)) charged in count I; assault with a deadly weapon (count II-§ 245, subd. (a)(1)); corporal injury to a spouse (count III-§ 273.5, subd. (a)); and possession of injection paraphernalia (count IV-Health & Saf. Code, § 11364). The jury also found true allegations in counts I and II that Lopez inflicted great bodily injury within the meaning of section 12022.7 and that he personally used a deadly weapon within the meaning of section 12022, subdivision (b). On appeal, Lopez contends 1) the court committed instructional error, and 2) the court did not award him all the presentence custody credit to which he is entitled. We will find merit in Lopez's second contention. In all other respects, we will affirm the judgment.

FACTS

*The Prosecution Case*

On July 24, 1991, at 7 p.m., Pricilla Minchue, Lopez's common law wife, and her two young sons went across the street to the home of Mary Lopez (Mary). Prior to that, Minchue and appellant Lopez had an argument; she was angry at him because of his cocaine use. Lopez, in turn, was upset with her because some neighbors told Lopez that Minchue had an affair while Lopez was in Mexico for two months in a drug rehabilitation program. During that argument, as recounted by Minchue in her trial testimony, Lopez thought there was another man in the house. He looked for the man in odd places: on a TV, on a refrigerator, behind a door, behind a dryer, and behind a refrigerator. Minchue went to Mary's house after Lopez pulled the telephone from the wall as Minchue attempted to call the police.

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

Minchue did not actually see Lopez use cocaine on July 24, 1991. However, she claimed that she could tell when Lopez was under the influence of cocaine because of his attitude and because Lopez would act nervous. Minchue believed that Lopez was under the influence of cocaine that day because of his attitude and because she believed he was hallucinating. However, on this occasion Lopez did not claim to see something that was not there. Minchue additionally acknowledged that Lopez acted somewhat differently than he usually acted while under the influence of cocaine.

Lopez followed Minchue to Mary's house. After Minchue entered the house to call the police, Lopez stayed outside for a few minutes before leaving. A short while later, Lopez returned to Mary's house and asked to speak with Minchue. Mary refused to allow Lopez inside and slammed the door in his face. Lopez kicked in the door and grabbed Minchue by the hair. He took Minchue to the front porch where he kicked and punched her as she lay on the ground.

Florentino Hernandez attempted to come to Minchue's aid. However, as Hernandez approached Lopez, Lopez pulled a steak knife from his back pocket and stabbed Hernandez five times including once in the chest.[2] Lopez ran away when Glen Urbina struck Lopez on his back with a stick.

During a subsequent search of Lopez's house, police officers found a hypodermic syringe and other injection paraphernalia.

### The Defense Case

Lopez testified that he stabbed Hernandez in self-defense after Hernandez and Urbina attacked him. According to Lopez, in the early morning of July 24, 1991, Minchue got mad at him after he injected himself twice with a total of $20 worth of cocaine. The argument continued until Lopez left the house and drove to the mountains. When he returned, although the cocaine was still in his system, he was no longer under its influence.[3] Nevertheless, Minchue continued arguing with Lopez until she went to Mary's house. After Lopez broke down Mary's front door, Hernandez began fighting with Lopez. As Lopez struggled with Hernandez, Urbina hit Lopez at least six times from behind with a stick. Lopez took out a knife and stabbed Hernandez in order to get away from Hernandez and Urbina. Except for slapping Minchue, Lopez denied otherwise striking her.

---

[2] The knife penetrated Hernandez's right lung and damaged an artery on the right side of his chest.

[3] According to Lopez, cocaine causes auditory and visual hallucinations and its effects last about 10 minutes.

*Jury Instructions*

The court instructed the jury, pursuant to the prosecutor's request, with the language of CALJIC No. 4.21 as follows:

"[I]n the crime of attempted second degree murder which the defendant is accused [of] in Count I of the [i]nformation, a necessary element is the existence in the mind of the defendant of the specific intent to kill a human being, and that mental state [of] malice aforethought.

"[I]f the evidence shows that the defendant was intoxicated at the time of the alleged crime in Count I, you should consider that fact in determining whether defendant had such specific intent or mental state.

"If from all the evidence you have a reasonable doubt whether the defendant formed such specific intent or mental state, you must find that he did not have such specific intent or mental state."

The court did not charge the jury with an instruction that specifically related voluntary intoxication to the offense of attempted voluntary manslaughter. Nor did defense counsel request any such instruction.

## DISCUSSION

### *The Alleged Instructional Error*

 Lopez contends the court erred by its failure to instruct the jury, sua sponte, on the effect of voluntary intoxication on the specific intent required for attempted voluntary manslaughter. We will reject this contention.

 "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) "The duty to instruct, sua sponte, on general principles closely and openly connected with the facts before the court also encompasses an obligation to instruct on defenses . . . and on the relationship of these defenses to the elements of the charged offense." (*People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913], italics omitted.)

 However, "under the law relating to mental capacity as it exists today, it makes more sense to place on the defendant the duty to request an

instruction which relates the evidence of his intoxication to an element of a crime, such as premeditation and deliberation. This is so because the defendant's evidence of intoxication can no longer be proffered as a defense to a crime but rather is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt. In such a case the defendant is attempting to relate his evidence of intoxication to an element of the crime. Accordingly, he may seek a 'pinpoint' instruction that must be requested by him [citation], but such a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court. . . ." (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

 Here, Lopez did not request an instruction that related voluntary intoxication to attempted voluntary manslaughter. Further, under *Saille* the court did not have a sua sponte duty to instruct the jury in this regard.

 Lopez contends the above holding by the *Saille* court represents a new rule of law. He further posits that it would be unfair to apply this rule to his case because his trial concluded one day before the *Saille* decision issued.[4] We disagree.

"To determine whether a decision should be given retroactive effect, the California courts first undertake a threshold inquiry: does the decision establish a new rule of law? If it does, the new rule may or may not be retroactive, as we discuss below; but if it does not, 'no question of retroactivity arises,' because there is no material change in the law. . . .

" . . . . . . . . . . . . . . . . . . . . . . . .

"If the decision establishes a new rule of law, a second question arises: was there a prior rule to the contrary? If there was, the new rule—again— may or may not be retroactive, as we discuss below; if there was not, the new rule applies in all cases not yet final. This is so for the obvious reason that there cannot have been any *justifiable* reliance on an old rule when no old rule existed. And the emphasized word is crucial: 'Unjustified "reliance" is no bar to retroactivity.' [Citation.] It follows that 'In all such cases the ordinary assumption of retrospective operation [citations] takes full effect.' [Citation.]

" . . . . . . . . . . . . . . . . . . . . . . . .

---

[4]Lopez's trial concluded on December 11, 1991. The *Saille* decision issued on December 12, 1991.

"Examples of decisions that establish a new rule when there was no prior rule to the contrary are noted as follows in [*People* v. *Donaldson* (1983) 35 Cal.3d 24, 37 (196 Cal.Rptr. 704, 672 P.2d 110)]: 'Neither is there any issue of retroactivity when we resolve a conflict between lower court decisions, or address an issue not previously presented to the courts.' The latter category, of course, also includes instances in which the issue was presented but not squarely decided in the prior opinions, or in which prior Court of Appeal decisions resolving it were vacated by grants of hearing in this court [citation]. In each of these cases there was no clear rule on which anyone could have justifiably relied." (*People* v. *Guerra* (1984) 37 Cal.3d 385, 399-400, fn. omitted [208 Cal.Rptr. 162, 690 P.2d 635].)

In *Saille*, the Supreme Court noted that although voluntary intoxication technically was never a defense, "[w]hen voluntary intoxication became subsumed by diminished capacity, it was treated as a part of the defense of diminished capacity. [Citations.] The withdrawal of diminished capacity as a defense[5] removes intoxication from the realm of defenses to crimes. Intoxication is now relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state." (*People* v. *Saille*, *supra*, 54 Cal.3d at p. 1119.)

The only cases, since the abolition of diminished capacity as a defense, that have dealt with the issue of the court's duty to instruct on the principles of CALJIC No. 4.21 are *People* v. *Whitler*, *supra*, 171 Cal.App.3d 337 and *People* v. *Ramirez* (1990) 50 Cal.3d 1158 [270 Cal.Rptr. 286, 791 P.2d 965]. In *Whitler*, Justice Sims concluded, in a concurring opinion, that the court did not have a sua sponte duty to instruct the jury on the relation of voluntary intoxication to a defendant's formation of the requisite mental state. (*People* v. *Whitler*, *supra*, at pp. 342-343.) In *Ramirez*, the Supreme Court stated that a trial court did have such a duty. (*People* v. *Ramirez*, *supra*, at pp. 1179-1180.) However, the *Ramirez* discussion on this issue was dicta because the court found the record did not contain substantial evidence of the defendant's intoxication which would warrant an instruction on voluntary intoxication. (*Id.* at pp. 1180-1181, see also *People* v. *Saille*, *supra*, 54 Cal.3d at pp. 1118-1119.) Thus, assuming that *Saille* announced a new rule of law, it appears that the rule falls into the category of issues that were not "squarely decided in prior opinions." Further, in accord with *Guerra*, we reject Lopez's contention that the rule announced in *Saille* should not be applied retroactively to his case.

 Moreover, even if the *Saille* decision did not apply to Lopez's case, we would still find that the court did not have a sua sponte duty to instruct

---

[5]In 1982 the Legislature eliminated diminished capacity as a defense. (*People* v. *Whitler* (1985) 171 Cal.App.3d 337, 341 [214 Cal.Rptr. 610].)

on voluntary intoxication as Lopez contends. In *Ramirez,* the Supreme Court stated the following: "In *People* v. *Flannel* (1979) 25 Cal.3d 668 . . . , a case involving the question whether there was sufficient evidence of intoxication to support a diminished capacity instruction, we explored the appropriate standard governing a trial court's duty to instruct on an issue. We explained that '[i]n substance when diminished capacity is at issue a trial court first evaluates the evidence. If defendant proffers evidence enough to deserve consideration by the jury, i.e., "evidence from which a jury composed of reasonable men could have concluded that there was diminished capacity sufficient to negate the requisite criminal intent" [citation], the court must so instruct. A trial court should not, however, measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, a task exclusively relegated to the jury. If the evidence should prove minimal and insubstantial, however, the court need not instruct on its effect. [Citations.] In other words, "[t]he court should instruct the jury on every theory of the case, but only to the extent each is supported by substantial evidence." [Citation.] We likewise note that "[d]oubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." [Citations.]' [Citation.]" (*People* v. *Ramirez, supra,* 50 Cal.3d at p. 1180.)

In *Ramirez,* the defendant testified 1) he drank eight to ten beers during the evening prior to the death of the victim and 2) he was more intoxicated on the night of the killing than when he was arrested a few days later with a blood-alcohol level of .14 percent. Neither the defendant nor any other witness testified that the defendant's drinking had any effect on his mental state or actions. Based on these circumstances, the court found that the trial court did not have a duty to instruct on intoxication. (*People* v. *Ramirez, supra,* 50 Cal.3d at pp. 1180-1181.)

Here, as in *Ramirez,* the evidence of Lopez's intoxication was minimal and insubstantial. Lopez testified that on September 24, 1991, he only used cocaine in the morning when he injected himself twice. He also testified that the effects of cocaine last only 10 minutes and that in the evening when he stabbed Hernandez he was no longer under its influence.

Further, although Minchue testified that she believed Lopez was under the influence of cocaine, her testimony was inconclusive. Minchue did not see Lopez use cocaine that day. Also, she based her conclusion that Lopez was intoxicated on Lopez's anger and his actions in looking for a man in the house. However, Minchue testified that Lopez was jealous because neighbors told him that Minchue had an affair while Lopez was in Mexico. She also admitted that Lopez had not previously had a similar reaction when he

had used cocaine. Thus, it appears from Minchue's own testimony that Lopez's actions resulted from a fit of jealousy, not from having ingested cocaine. Further, the defense did not present any expert testimony on the effects of cocaine or their duration. In these circumstances, the court did not have a sua sponte duty to charge the jury with an instruction that specifically related voluntary intoxication to the offense of attempted voluntary manslaughter. Its failure to do so did not constitute error.

### Presentence Credits

■ The court awarded Lopez two days of actual custody credit and no conduct credit for a total of two days of presentence custody credit. Lopez contends he is entitled to three days of actual custody credit. We will find that Lopez is entitled to an additional day of actual custody credit as he contends.

The probation report indicates that Lopez was taken into custody in this matter on September 8, 1991, and released on September 10, 1991. Accordingly, Lopez is entitled to three days of actual custody credit for the three days he spent in custody. (§ 4019.)

### DISPOSITION

The judgment is modified to award Lopez one additional day of actual custody credit for a total of three days; the total presentence custody credit is modified accordingly to reflect a total of three days of presentence custody credit. The trial court is directed to prepare an amended abstract of judgment consistent with this opinion and to forward a certified copy to the Department of Corrections. As modified, the judgment is affirmed.

Vartabedian, J., and Buckley, J., concurred.

A petition for a rehearing was denied December 14, 1992.