Filed 5/29/14  P. v. Ocampo CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FRANCISCO DELGADO OCAMPO,<br><br>    Defendant and Appellant. | G048314<br><br>(Super. Ct. No. 11CF0868)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Daniel Barrett McNerney, Judge.  Affirmed as modified.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted 71-year-old Francisco Ocampo of attempted murder (Pen. Code, §§ 187; 664) for stabbing his neighbor, Marvin Escobar, in the jugular and upper arm.[1] (All further statutory references are to the Penal Code unless noted.) The jury found true enhancement allegations that Ocampo used a deadly weapon (§ 12022, subd. (b)(1)) and inflicted great bodily injury (§ 12022.7, subd. (a)), but concluded he did not act with premeditation and deliberation (§ 664, subd. (a)). The trial court instructed the jury voluntary intoxication may prevent a person from forming the requisite intent for murder or from acting with premeditation and deliberation (CALCRIM No. 625), but Ocampo contends the trial court erred in failing to instruct the jury sua sponte on voluntary intoxication to the point of unconsciousness (CALCRIM No. 626). He also argues the trial court erred in granting the prosecutor's pretrial motion to dismiss an aggravated assault charge (§ 245, subd. (a)(1)), enabling the prosecutor to proceed only on an "all or nothing" theory of attempted murder. Ocampo further contends the $240 restitution fine the trial court imposed violated ex post facto protections and, finally, the Attorney General concedes and we agree Ocampo is entitled to two additional days of presentence custody credit. As we explain, Ocampo's substantive claims are without merit, but he correctly argues he is entitled to an additional day of worktime credit. We therefore affirm the judgment as modified (§ 1260) to reflect the additional custody and worktime credits.

I

FACTUAL AND PROCEDURAL BACKGROUND

Around 2:45 p.m. on April 3, 2011, Ocampo passed by the Escobars' apartment as he drove out of the neighborhood on his way to a pharmacy. He had been

---

[1]    For ease of reference, we use Marvin's first name in the remainder of the opinion to distinguish him from his father, Roberto Escobar, a witness.

friends with both Marvin and Marvin's father, Roberto, for six to eight years, and he spoke with them weekly.  Roberto was at work that day, but Marvin was outside and when Ocampo stopped beside him, Marvin joined him to go to the store.  Marvin noticed Ocampo smelled of alcohol, but he was not intoxicated.  They stopped at three pharmacies before finding the cream Ocampo needed, and then Marvin picked up four large cans of beer at the liquor store.

They returned to Marvin's home around 4:30 p.m. and sat outside chatting for awhile.  Each opened a beer, but Ocampo did not like his and when another neighbor came by, Ocampo went with the neighbor to purchase other beer.  They returned with three tall cans and two 40-ounce bottles of beer.  Roberto joined them around 6:00 p.m. and, after about an hour, he and Marvin walked with Ocampo about a block to Ocampo's apartment.  Ocampo did not drive home because he had been drinking, and the Escobars walked with him because he mentioned he felt dizzy, but when they arrived, he invited them in, gave each a soda, and they all sat down on Ocampo's couch.  Ocampo had an unknown beverage in his hand, but neither Marvin nor his father noted in their testimony anything unusual about Ocampo's behavior.  The trio chatted for about a half hour, and then the Escobars decided it was time to leave.

As Martin stood up, he noticed Ocampo hurry to the kitchen, where he saw him retrieve a large butcher knife from a drawer.  Roberto had already made his way out of the apartment, and when Ocampo met Marvin at the apartment's exterior door, he asked Ocampo why he had the knife.  Ocampo pushed him out the door, stating, "I don't care," and Marvin turned and walked away.  He passed by about four apartments before Ocampo caught him from behind, stabbed him in the neck, and then stabbed him again in

3

his arm near his armpit. Roberto came to his son's aid and disarmed Ocampo, who retreated inside his apartment and closed the door.

Marvin was bleeding profusely, and a responding officer initially thought he was dead because he did not appear to be breathing. Paramedics found him with no vital signs, but resuscitated him and rushed him to the hospital, where doctors sutured his jugular vein and a wound on his arm near his armpit. He spent four days in the hospital, and his treating physician testified he was lucky to have survived.

Meanwhile, two police officers forced their way into Ocampo's apartment, where they found him changing into a new shirt. He told the officers he had consumed only two large beers that day. He was arrested and charged as noted, and after the jury reached its verdict, the trial court sentenced Ocampo to nine years in prison. He now appeals.

## II

## DISCUSSION

### A. *Voluntary Intoxication Causing Unconsciousness Instruction*

Ocampo argues the trial court erred by failing sua sponte to instruct the jury on unconsciousness due to voluntary intoxication. The trial court must instruct the jury on the "general principles of law governing the case," consisting of "those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531; accord, *People v. Breverman* (1998) 19 Cal.4th 142, 154.) This duty includes instructing the jury on voluntary intoxication causing unconsciousness if substantial evidence supports the finding. (*People v. Ochoa* (1998) 19 Cal.4th 353, 423-424.) The evidence did not support the instruction here.

4

The trial court instructed the jury on voluntary intoxication generally, as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. [¶] A person is *voluntarily intoxicated* if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose." (CALCRIM No. 625, original italics.)

Ocampo asserts the trial court was required to instruct the jury on voluntary intoxication causing unconsciousness (CALCRIM No. 626) because potential unconsciousness explained his actions.[2] According to Ocampo, "the only theory that makes sense of the evidence is that appellant blacked out and, for whatever reason,

---

    ² CALCRIM No. 626 provides: "Voluntary intoxication may cause a person to be unconscious of his or her actions. *A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions.* [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter. [¶] Involuntary manslaughter has been proved if you find beyond a reasonable doubt that: [¶] 1. The defendant killed without legal justification or excuse; [¶] 2. The defendant did not act with the intent to kill; [¶] 3. The defendant did not act with a conscious disregard for human life; [¶] AND [¶] 4. As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of [attempted murder]." (First italics added.)

thought that he had to stab Marvin." Reasoning from the absence of a motive, however, is not itself evidence that the defendant was in an unconscious state. Put another way, defendant's approach is conclusory rather than based in evidence of unconsciousness, as required to support giving the instruction.

No evidence suggested Ocampo was unconscious. He answered the responding officers intelligibly, telling them he only consumed two beers and, even assuming he underreported his alcohol intake, nothing in the evidence suggests he was unaware of his surroundings. He appeared to have made up his mind to commit the crime, stating ominously, "I don't care" when Marvin asked why he was holding the knife. There was no evidence he did not realize it was a knife or that he flailed wildly with it in an unconscious fashion.

Instead, he left his apartment, tracked his victim down, stabbed him in the jugular, removed the knife, and stabbed him again. He then retreated to his apartment and changed his clothes. (See *People v. Kimble* (1988) 44 Cal.3d 480, 497 [flight reflects consciousness of guilt].) Ocampo was not required to testify to explain his actions, but on the evidence presented, nothing suggested he was unaware of his actions and therefore the trial court was not required to instruct the jury on unconsciousness due to intoxication.

B.      *Dismissal of Aggravated Assault Charge*

Ocampo contends the trial court erred in granting the prosecutor's request to dismiss the aggravated assault charge on the eve of trial. He insists the trial court misunderstood the scope of its discretion under section 1385, which allows the court in the interest of justice to decline a prosecutor's dismissal request. According to Ocampo, the trial court revealed its misapprehension of the scope of its discretion by explaining in

6

rejecting Ocampo's opposition to the dismissal: "I'm unaware of any legal authority . . . that would give the court the prerogative of requiring the prosecution to proceed on charges that it doesn't want to proceed on." Ocampo relies on the principle that reversal is required when a trial court misunderstands the scope of its discretion, even if its decision was reasonable. (See, e.g., *Perko's Enterprises, Inc. v. RRNS Enterprises* (1992) 4 Cal.App.4th 238, 245.)

The trial court was not mistaken. While it is true that dismissal under section 1385 is a judicial function (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 514-515), that does not change the fact that prosecuting crimes is solely an executive office and the prosecutor's prerogative. Ocampo asserts the trial court was required to deny dismissal of the charge in the interest of justice to prevent an "all or nothing" dilemma for the jury. He recognizes aggravated assault (§ 245, subd. (a) [assault with a deadly weapon]) is not a lesser included offense of attempted murder. (*People v. Parks* (2004) 118 Cal.App.4th 1,6; see *People v. Dixie* (1979) 98 Cal.App.3d 852, 856 [observing murder may be committed without committing an assault with a deadly weapon or by means of force likely to cause great bodily injury, for example by withholding food from an invalid]. Because of this, Ocampo contends it was unfair to present the jury with the stark choice of convicting him of attempted murder or acquitting him entirely, without consideration of aggravated assault as a lesser related offense.

But instruction on lesser related offenses is not required as a matter of due process. (*Hopkins v. Reeves* (1998) 524 U.S. 88; accord, *People v. Birks* (1998) 19 Cal.4th 108, 134-136 (*Birks*) [criminal defendant not "entitle[d] to instructions on lesser offenses which are not necessarily included in the charge"], overruling *People v. Geiger* (1984) 35 Cal.3d 510.) The prosecutor therefore may charge the case as she

chooses and risk acquittal if the jury finds she has not met her burden of proof. As the Supreme Court explained in *Birks*, it is the prosecutor's "sole discretion to determine whom to charge with public offenses and what charges to bring." (*Birks*, at p. 134.) It therefore follows that the trial court did not err in granting the prosecutor's dismissal request here.

C.    *Credits*

The Attorney General concedes Ocampo is entitled to two additional days of presentence custody credit to include the day he was taken into custody and the day of sentencing. (*People v. Lopez* (1992) 11 Cal.App.4th 1115, 1124.) He is therefore entitled to 741 days of custody credit from April 3, 2011 to April 12, 2013. The trial court also awarded Ocampo 110 days of worktime credit, calculated at 15 percent (§ 2933.1) on 739 days of presentence custody credit. The Attorney General contends the two additional days of presentence custody credit should not yield an additional day of worktime credit, since worktime credit is calculated at 15 percent. But 15 percent of 741 days is 111.15 days, not the 110 days of worktime credit the trial court awarded. In sum, Ocampo is entitled to 741 days of presentence custody credit and 111 days of worktime credit, which is three more days of total credit than the trial court awarded. We modify the judgment accordingly. (§ 1260.)

D.    *Ex Post Facto*

Ocampo argues the trial court violated the prohibition against ex post facto punishment (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9) by imposing a restitution fine of $240 instead of $200. Section 1202.4 provided for a restitution fine between $200 and $10,000 when Ocampo committed his offense. He infers from his request for the minimum fine that the trial court intended to impose the statutory minimum, but

mistakenly selected the $240 figure from the newly amended versions of sections 1202.4 and 1202.45. The claim is forfeited, however, because Ocampo did not object, and the $240 amount is not otherwise appealable as an unauthorized sentence. (*People v. Nelson* (2011) 51 Cal.4th 198, 227; *People v. Scott* (1994) 9 Cal.4th 331, 354.)

Even overlooking the forfeiture, Ocampo's claim fails. He relies on *Peugh v. United States* (2013) 569 U.S. __, 133 S.Ct. 2072, where the federal sentencing guidelines at the time of the defendant's fraud offense recommended a 37 to 46 month prison term, but the trial court sentenced him to 70 months consistent with a new guideline range of 70 to 87 months. The high court explained that "applying amended sentencing guidelines that increase a defendant's recommended sentence *can* violate the Ex Post Facto Clause, notwithstanding the fact that sentencing courts possess discretion to deviate from the recommended sentencing range." (*Id.* at p. 2082, italics added.) But the court also explained the "touchstone" for an ex post facto violation "is whether a given change in law presents a '"sufficient risk of increasing the measure of punishment attached to the covered crimes."' [Citations.] The question when a change in law creates such a risk is 'a matter of degree' . . . ." (*Ibid.*)

The de minimus $40 amount here does not implicate ex post facto concerns. As our Supreme Court has explained, this constitutional safeguard is based on a policy of "fair warning" (*In re Ramirez* (1985) 39 Cal.3d 931, 938) "to prevent unforeseeable punishment" (*People v. Snook* (1997) 16 Cal.4th 1210, 1221). The $240 amount was well within the applicable range of punishment and not so different in degree from $200 to trigger the ex post facto bar.

9

## III

## DISPOSITION

The judgment is modified (§ 1260) to reflect presentence custody credit of 741 days and worktime credit of 111 days.  As modified, the judgment is affirmed.  The trial court is directed to correct the abstract of judgment accordingly and to forward a copy of the corrected abstract to the Department of Corrections and Rehabilitation.


ARONSON, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.