Filed 10/15/14  P. v. Coles CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057946 |
| v. | (Super.Ct.No. RIF1105613) |
| REGINALD COLES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard Todd Fields, Judge.  Affirmed.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Reginald Coles guilty of second degree murder (Pen. Code, § 187, subd. (a))[1] with the personal use of a knife (§ 12022, subd. (b)(1)). Defendant was sentenced to a total term of 16 years to life in state prison. On appeal, defendant contends the trial court prejudicially erred by refusing to instruct the jury on the habitation defense (CALCRIM No. 506). We reject this contention and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

On October 22, 2011, defendant and his wife, Stephanie McKaney, lived in an upstairs apartment in a two-story apartment complex in Moreno Valley. Nicole Patton and Charla Malbrew lived in the apartment directly below defendant and his wife. On that day around noon, while taking out the trash, Patton saw defendant sitting on his porch with a neighbor. Defendant was sharpening a homemade knife, which Patton called a "shank," by "raking it back and forth" across the porch's concrete floor and the balcony's metal rail.

Later that evening, McKaney called 911 to report defendant had grabbed and twisted her arm during an argument and punched a hole in their kitchen wall. Riverside County Sheriff's deputies responded to the domestic violence call and convinced defendant to leave the apartment complex. Two to three hours later, defendant returned, and McKaney again called 911. McKaney reported that defendant had "destroyed the

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

house" and "took a knife and carved a headstone in the wall over [McKaney's] side of the bed." By the time the deputies arrived, defendant had left the apartment. Members of McKaney's family subsequently came and picked up McKaney and her two young sons and they left the apartment.

While the family was at a restaurant, McKaney's brother, Melvin Jackson, called and was informed of the incident. Jackson asked if he could spend the night at McKaney's apartment with McKaney and her two sons. McKaney and her sons were dropped back off at McKaney's apartment; Jackson and his friend Sheldon arrived soon thereafter. Defendant was not at the apartment. After about 30-40 minutes, Jackson went downstairs to visit Malbrew. Sheldon stayed upstairs with McKaney and her sons.

Sheldon later came to Patton and Malbrew's apartment and asked for Jackson to come upstairs because defendant was out of control and making threats. Jackson and Sheldon went upstairs followed later by Patton and Malbrew. Defendant sounded agitated and kept saying he was getting his "shit." Jackson calmly told defendant to hurry up so defendant could leave. While Jackson and McKaney were standing near a couch and Sheldon was in the kitchen, defendant was in front of his television, unhooking wires. After dealing with the wires for a couple of minutes, defendant pushed the television back against the wall and stormed out of the apartment with McKaney following him. McKaney and defendant walked down the stairs while Jackson, Sheldon, Patton, and Malbrew stood outside at the top of the stairs to McKaney's apartment.

At the bottom of the stairs, defendant asked McKaney for something. McKaney responded that she did not have anything and told defendant to leave. Defendant then tried grabbing McKaney's neck, but because McKaney shrugged back, grabbed her shirt instead and called her a "Bitch." Jackson told defendant not to put his hands on his sister. Defendant then let go of McKaney and rushed up the stairs, saying, "Or what? Or what? What you going to do about it?" Jackson headed down the stairs and defendant and Jackson met in the middle of the stairway. Defendant swung a fist at Jackson, and Jackson kicked defendant, causing defendant to stumble back a couple of steps.

Defendant charged back up the stairs at Jackson. Defendant had an object in his other hand and swung at Jackson with that hand. When defendant swung the second time, he hit Jackson and Jackson made an "Oh" sound. The two men tumbled down the stairs together, with Jackson landing on top of defendant at the bottom of the stairs. Jackson was yelling, "Oh, he's stabbing me. Oh, he's stabbing me. Get him. Get him." Defendant continued stabbing Jackson while they were on the ground. Sheldon and the others eventually pulled defendant away from Jackson. Defendant stood up with the knife still in his hand and said, "Who's kicking me in my head?" McKaney said, "You stabbed my brother." Defendant responded, "You next, Bitch." When McKaney and Patton said they were calling the police, defendant fled.

When deputies arrived, Jackson was still responsive. Jackson reported that defendant had stabbed him, but lost count of how many times; and that defendant had said he was going to kill him. Deputies found blood droplets from the middle of the

4

stairway down to a large amount of blood at the bottom of the staircase. Jackson died at the hospital shortly thereafter. The cause of death was a stab wound to Jackson's aorta, causing him to bleed to death.

At the urging of his brother, defendant eventually turned himself into police on November 1, 2011. He admitted to police that he had stabbed Jackson with a knife, but refused to provide the location of the knife. In later conversations with his brother, defendant said Jackson was unarmed.

The defense case consisted of portraying Jackson as a violent person who used drugs and alcohol on the day of the incident. A toxicologist testified that Jackson had a blood alcohol level of 0.14 percent, methamphetamine, opiates, cannabinoids, and benzodiazepines in his blood at the time of death. Two of Jackson's former girlfriends testified that Jackson was often violent with them and that there were incidents of domestic violence between them.

II

DISCUSSION

During the hearing on jury instructions, defense counsel requested that the trial court instruct the jury on the defense of habitation in accordance with CALCRIM No. 506. Counsel argued that even though the actual confrontation between defendant and the victim occurred outside the apartment on the bottom of the stairs, there was evidence that the victim had been invited to defendant's apartment to commit some act of violence against defendant. Counsel also asserted that there was circumstantial evidence

to show the victim went upstairs to defendant's apartment after the friend reported defendant was out of control to commit an act of violence against defendant. The prosecutor argued that the habitation defense was designed for situations "where there's somebody in his own home and you have some kind of intruder that enters the home," giving "you the right to protect the home that you're in." The prosecutor also noted that the altercation occurred outside of the home and that defendant went up the stairs to engage in an altercation with the victim, not in an attempt to protect his home or himself.

The trial court refused to give the instruction, noting that defendant was not defending his home or habitation when he stabbed the victim as the victim was walking away from the home down the stairs. The court explained: "at the time of this incident, there's no evidence that the victim was going in the home so the defendant had to come and protect it. It's actually the exact opposite. . . . The victim is coming down the stairs away from the home. The defendant is going up the stairs towards the [victim]." The court further noted that defendant was challenging the victim after the victim told defendant to leave his sister alone and then approached the victim as the victim was coming down the stairs and away from the home. The trial court did instruct the jury on self-defense and imperfect self-defense in accordance with CALCRIM Nos. 505 and 571 and on first and second degree murder and voluntary manslaughter based on heat of passion.

Defendant contends that the trial court improperly refused to instruct the jury on the defense of habitation in accordance with CALCRIM No. 506. He argues there was substantial evidence from which the jury could have determined defendant was acting to defend himself and his home from the "overly aggressive" victim and that it was for the jury to either accept or reject the defense. This contention is meritless.

CALCRIM No. 506 provides, in pertinent part, that a defendant is not guilty of murder if he killed to defend himself [or any other person] in the defendant's home. Such a killing is justified, and therefore not unlawful, if:

"1. The defendant reasonably believed that he was defending a home against [Melvin Jackson], who intended to or tried to commit [a forcible and atrocious crime][2] or violently, or riotously, or tumultuously tried to enter that home intending to commit an act of violence against someone inside;

"2. The defendant reasonably believed that the danger was imminent;

"3. The defendant reasonably believed that the use of deadly force was necessary to defend against the danger; [¶] AND

"4. The defendant used no more force than was reasonably necessary to defend against the danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to himself. Defendant's belief must have been reasonable

---

[2] The Supreme Court noted, "Examples of forcible and atrocious crimes are murder, mayhem, rape and robbery." (*People v. Ceballos* (1974) 12 Cal.3d 470, 478.)

and he must have acted only because of that belief.  The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, then the killing was not justified.  [¶]  When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.  [¶] . . . [¶]  The People have the burden of proving beyond a reasonable doubt that the killing was not justified.  If the People have not met this burden, you must find the defendant not guilty of murder."  (CALCRIM No. 506; see § 197.)

Errors in jury instructions are questions of law, which we review de novo.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)  " ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."  [Citation.]' "  (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  This duty " 'encompasses an obligation to instruct on defenses . . .' "  (*People v. Lopez* (1992) 11 Cal.App.4th 1115, 1120) that are "supported by substantial evidence . . . [and] that are not inconsistent with the defendant's theory of the case."  (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047).

8

"[T]he existence of 'any evidence, no matter how weak' will not justify instructions . . . , but such instructions are required whenever evidence . . . is 'substantial enough to merit consideration' by the jury." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.) " 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Lewis* (2001) 25 Cal.4th 610, 645.) In making this assessment, the court is not to assess the credibility of witnesses, a task for the jury. (*People v. Breverman*, *supra*, at p. 162.)

The habitation defense finds its statutory genesis in section 197, originally adopted in 1872 in substantially its current form, which states in part: "Homicide is also justifiable when committed by any person in any of the following cases: [¶] . . . [¶] 2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein. . . ." (§ 197.)

"Defense of habitation applies where the defendant uses reasonable force to exclude someone he or she reasonably believes is trespassing in, or about to trespass in, his or her home. However, the intentional use of deadly force merely to protect property is never reasonable. Accordingly, a homicide involving the intentional use of deadly force can never be justified by defense of habitation alone. The defendant must also show either self-defense or defense of others, i.e., that he or she reasonably believed the

9

intruder intended to kill or inflict serious injury on someone in the home." (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360 [Fourth Dist., Div. Two] (*Curtis* ).) "Like traditional self-defense, . . . defense of habitation applies only if the defendant's belief that a trespass is occurring or about to occur is reasonable." (*Id*. at p. 1361.)

The " 'right of defending one's dwelling is in some sense superior to that of the defense of his person; for in the latter case it is frequently the duty of the assaulted to flee, if the fierceness of the assault will permit, while in the former a man assaulted in his dwelling is not obliged to retreat, but may stand his ground, defend his possession and use such means as are absolutely necessary to repel the assailant from his house, even to the taking of life.' " (*People v. Hubbard* (1923) 64 Cal.App. 27, 36.)

Section 198.5 provides a presumption to aid in establishing the habitation defense. It states: "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred." (§ 198.5.) The purpose of section 198.5 is "to permit residential occupants to defend themselves from intruders without fear of legal repercussions, to give 'the benefit of the doubt in such cases to the resident . . . .'" (*People v. Owen* (1991) 226 Cal.App.3d 996, 1005.)

10

"For section 198.5 to apply, four elements must be met.  There must be an unlawful and forcible entry into a residence; the entry must be by someone who is not a member of the family or the household; the residential occupant must have used 'deadly' force (as defined in § 198.5) against the victim within the residence; and finally, the residential occupant must have had knowledge of the unlawful and forcible entry." (*People v. Brown* (1992) 6 Cal.App.4th 1489, 1494-1495; see *People v. Hardin* (2000) 85 Cal.App.4th 625, 633, fn. 5.)  A defendant, however, "is not entitled to the benefit of this presumption [where] there [is] no actual entry."  (*Curtis*, *supra*, 30 Cal.App.4th at p. 1362.)

The touchstone of CALCRIM 506's defense of habitation is reasonableness.  On the facts of this case, in order to demonstrate entitlement to an instruction on the defense of habitation, defendant must be able to point to substantial evidence in the trial record showing that he reasonably believed he was defending his home against the victim, who intended to or tried to commit the forcible and atrocious crime of robbery, murder, or mayhem, or violently, riotously, or tumultuously tried to enter that home intending to commit an act of violence against someone inside the home.  (CALCRIM No. 506.)

In *Curtis*, *supra*, 30 Cal.App.4th 1337, the defendant shot and killed his girlfriend when she came to his apartment to negotiate the return of her car, which the defendant had stolen.  (*Id*. at pp. 1342-1343, 1349.)  The girlfriend's brother and uncle went with her to the defendant's apartment but stayed outside.  When the brother became concerned about the length of time his sister had been inside with the defendant, he knocked on the

11

door.  (*Id*. at p. 1343.)  Defendant testified that he thought his girlfriend's brother, and perhaps other members of her family, were about to break down his door and attack him. He got out his rifle to defend himself.  The gun went off, accidentally killing his girlfriend.  (*Id*. at pp. 1343, 1350.)  Unbeknownst to defendant, his girlfriend carried a tape recorder in her purse, and it captured, albeit imperfectly, what occurred inside the apartment, including his threats to her and her screams and cries.  (*Ibid*.)

At trial, defendant requested instructions on defense of habitation.  The trial court declined to give the instruction, finding that there was no substantial evidence that the defendant's beliefs were reasonable.  This court agreed, finding that that there was "no substantial evidence that defendant's belief that [the victim's brother] was about to break in was reasonable.  As the trial court put it, 'No one was coming in.  No one was breaking in the door.' . . .  Because there was no evidence that a reasonable person in defendant's position would have believed [the brother] was about to break in, the trial court had no duty to instruct on defense of habitation."  (*Curtis*, *supra*, 30 Cal.App.4th at pp. 1361-1362.)

The same reasoning applies here.  There was no evidence here to suggest that defendant reasonably believed he was defending his home against the victim or that the victim intended to or tried to commit a forcible and atrocious crime, or that the victim forcibly entered the home intending to commit an act of violence against someone inside the home.  There was also no evidence to suggest that the victim was entering the home while defendant was outside arguing with his wife or that defendant went up the stairs to

12

protect the home. Rather, as the trial court explained, the evidence showed that the victim was coming down the stairs away from the home and defendant was going up the stairs to confront the victim, not to protect the home. The trial evidence does not contain substantial evidence that the victim entered defendant's home to rob him or murder him. Therefore, defendant was not entitled to an instruction on the defense of habitation.

Furthermore, while testimony of the defense witnesses may have supplied substantial evidence the victim had prior acts of violence, there was no substantial evidence that defendant charged up the stairs to protect his home or that defendant's beliefs were reasonable. In fact, none of the testimony provided any basis for a reasonable person to believe that the victim wanted to rob, maim, or murder defendant. Rather, the evidence showed that defendant went up the stairs to challenge the victim after the victim told defendant to leave his sister alone. Moreover, when defendant stabbed the victim, he was not defending his home. Defendant had no knowledge that the victim was armed or was doing anything more than trying to protect his sister. Because there was no evidence presented that a reasonable person in defendant's position would have believed that the victim entered defendant's home to murder him, maim him, or rob him, the trial court had no duty to instruct on defense of habitation.

Relying on *People v. Hatchett* (1942) 56 Cal.App.2d 20 (*Hatchett*), defendant argues that when defending his habitation, unlike in ordinary self-defense, he had the right to pursue the victim until he had secured himself from danger. This case is inapposite. In *Hatchett*, *supra*, 56 Cal.App.2d 20, the defendant testified that the

13

decedent was at her home in a drunken condition and that they had been quarreling. (*Id*. at p. 21.) The defendant went into the kitchen for several minutes and upon her return saw decedent with a " 'gun' " in his hand. (*Ibid*.) He pointed the gun at her and said, " 'I am going to shoot you tonight.' " (*Ibid*.) The defendant " 'ducked' " and ran into him, and the gun went off. (*Ibid*.) The defendant knocked the gun to the floor and a struggle ensued in which the defendant picked up the gun and started toward the rear door. Remembering that it was locked, she turned and saw the decedent coming toward her with a metal object in his hand. She pulled the trigger of the weapon, killing him. Decedent had a bad reputation in the community for peace and quietness. (*Hatchett* at pp. 21-21.)

In this context, *Hatchett* found the instruction that, "a person in the exercise of her right of self defense not only has a right to stand her ground and defend herself when attacked, but she may pursue her adversary until she has secured herself from danger," was a correct statement of the law. (*Hatchett*, *supra*, 56 Cal.App.2d at p. 22.) However, the statement in the instruction that the defendant could "pursue her adversary" was inapplicable to the facts, as *Hatchett* did not discuss the habitation defense; did not discuss section 197, subdivision 2; and was presented with no evidence that the defendant in that case pursued the decedent. She shot him as he aggressively approached her with a metal object. Furthermore, while the victim here had been inside defendant's apartment shortly before the victim was repeatedly stabbed, there was no evidence the victim forcibly entered the apartment; that he committed or attempted to commit an act of

14

violence inside the apartment; or that defendant chased the victim out of the apartment. In addition, no evidence indicated that defendant acted in the belief there was imminent danger to himself or others. Thus, defendant was not entitled to an instruction on defense of habitation.

Even if the trial court erred in failing to instruct on defense of habitation, that instruction was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The trial court instructed the jury on self-defense and imperfect self-defense with CALCRIM Nos. 505 and 571. Having convicted defendant of second degree murder, the jury rejected defendant's self-defense claim. As we explained in *Curtis*, "[A] homicide involving the *intentional* use of deadly force can never be justified by defense of habitation alone. The defendant must also show either self-defense or defense of others, i.e., that he or she reasonably believed the intruder intended to kill or inflict serious injury on someone in the home." (*Curtis*, *supra*, 30 Cal.App.4th at p. 1360, italics in original.) There was no evidence that defendant was defending his habitation from the victim at the time that he stabbed and killed the victim outside defendant's home.

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

KING
J.

MILLER
J.