Filed 4/2/15  P. v. Myers CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059514 |
| v. | (Super.Ct.No. INF1201508) |
| LAVON ALBERT MYERS, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Randall Donald White, Judge.  Affirmed.

Thien Huong Tran, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Arlene A. Sevidal and Alastair J. Agcaoili, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant LaVon Albert Myers was in an apartment with three other people. A woman (accompanied by a man) arrived and tried to confront one of the occupants. When defendant pulled out a gun, she tried to leave, but defendant started pistol-whipping her. The man accompanying her protested. Defendant shot him four times, killing him.

A jury found defendant guilty of second degree murder (Pen. Code, § 187, subd. (a)), with an enhancement for personally and intentionally discharging a firearm, causing death (Pen. Code, § 12022.53, subd. (d)). An enhancement for personal firearm use (Pen. Code, § 12022.5, subd. (a)) was also found true but was stayed. Defendant was sentenced to 40 years to life in prison.

Defendant now contends:

1. The trial court erred by failing to instruct on the right to use reasonable force to eject a trespasser.

2. The prosecutor committed misconduct by asking questions calling for hearsay even after the trial court sustained hearsay objections to similar questions.

We find no prejudicial error. Accordingly, we will affirm.

# I

## FACTUAL BACKGROUND

A.      *Prosecution Evidence*.

At one time, defendant and his girlfriend, Reina Rivas, lived in Apartment 16 of an apartment complex in Desert Hot Springs.  Later, however, they moved to Apartment 20 and let their friends Monica Gabaldon and David Gilbert stay in Apartment 16.

On June 29, 2012, around 8:00 p.m., Rebecca Goehner knocked on the door of Apartment 16.  She wanted to talk to Gabaldon because she had heard that Gabaldon had pepper-sprayed Goehner's nieces during a fight.  She admitted that she was "[s]omewhat" angry.  However, she considered Gabaldon a "good friend"; she just wanted "to find out what had actually happened, if indeed anything had happened."  Her friend Ronald Locke was with her.

Gabaldon and Gilbert were inside, with Rivas and defendant.  Rivas opened the door.  Goehner and Rivas had been friends for almost 20 years, but recently they "hadn't been getting along" because Goehner had said that Rivas "had a big mouth when she drank."  When Rivas saw Goehner, she started to push the door closed, but Goehner "pushed it back a little bit."  Gilbert said, "Let her in," and Rivas complied.  Locke waited outside.

Goehner talked first to Gilbert.  He confirmed that Gabaldon had been in a fight with her nieces.  Goehner then said, "Okay.  Well, I want to talk to [Gabaldon] then."

Gabaldon, however, had retreated into the bathroom.  Gilbert told Goehner to leave.  She argued with him.

Meanwhile, defendant went to Apartment 20 and retrieved a .32-caliber revolver.  When he got back to Apartment 16, he saw Locke standing outside.  He pointed the gun at Locke and told him to leave or he would shoot him.  Locke started walking away.

Defendant entered the apartment, pointed the gun at Goehner, and told her to leave.  Goehner said, "Oh, my God, what a pussy ass bitch, you're pointing a gun at a woman."  Both defendant and Gilbert told her again to leave.  Trying to comply, she took a step toward the door.  Just then, however, defendant took a swing at her with the gun.  She ducked.  Not knowing what else to do, she "rushed" defendant, hoping to knock him down so she could get out the door.  Instead, they ended up "in a crouching position" against a wall.  Defendant knelt over Goehner, repeatedly hitting her in the head with the gun.

When Locke heard Goehner yelling, he turned around and walked back to the apartment.  As he was either at the doorway or a few feet inside, he said, "What are you doing?  That's a woman.  Get off of her."

Defendant immediately turned toward Locke, pointed the gun at him, and fired one shot.  Locke turned and ran out the door.  Defendant "hesitated," then fired three more shots.  Locke "twitch[ed]" as the shots hit him.  He then "collapsed" facedown outside the apartment.

4

All four bullets hit Locke:  one in the right forearm, one in the right rear shoulder, one above the right buttock, and one in the left upper back.  The bullet in his back was fatal; it damaged his left lung and pulmonary artery, causing death within minutes.

Defendant started hitting Goehner with the gun again, but Gabaldon and Gilbert both told him to let her go.  Goehner left and called the police.  Defendant was arrested later that night.

After the shooting, Gabaldon and Gilbert were nowhere to be found.

B.      *Defense Evidence*.

Defendant testified on his own behalf.  According to defendant, both Goehner and Locke forced their way into the apartment.  Locke threatened Gabaldon, saying, "If that bitch does not come out of the bathroom, I'm coming in to get her."

Defendant went and got his gun; he merely intended to frighten Goehner and Locke into leaving.  After Goehner "rush[ed]" him, she ended up on top of him, fighting him for the gun.  The first shot went off by accident.[1]  Meanwhile, Locke came in and started fighting with Gilbert.  To protect Gilbert and the others in the apartment, defendant then intentionally fired four more shots at Locke, "[u]ntil [the gun] clicked."

Rivas also testified.  She largely confirmed defendant's account.  She testified that Locke was moving toward Gilbert with his fists up when the first shot went off.

---

[1]      Ten months after the shooting, a defense investigator observed what appeared to be a bullet hole in a closet door in Apartment 16.

5

However, she had told police that Locke was "at the doorway" and "not involved in the fight[.]"

Rivas also testified that, on the date of the shooting, she and defendant were still living in Apartment 16, in the process of moving to Apartment 20.

II

FAILURE TO INSTRUCT ON THE RIGHT

TO USE REASONABLE FORCE TO EJECT A TRESPASSER

Defendant contends the trial court erred by failing to give CALCRIM No. 3475 (Right to Eject Trespasser from Real Property).

A.    *Additional Factual and Procedural Background.*

During the instructions conference, there was this exchange:

"THE COURT:  . . .  [¶]  And your theory of the case, [defense counsel], is what kind of defense?

"[DEFENSE COUNSEL]:  Well, it's self defense as well as defense of others would be — and also I'm looking — I think it's 3475.

"THE COURT:  No.  You don't get both of them.  You either get 505 and 506 or you get the 3400 series.  It's not both.

"[PROSECUTOR]:  The 3400 series, I believe, applies to non-homicides, though.

"THE COURT:  Exactly.  It does indicate that.

"[PROSECUTOR]:  Yes.

"THE COURT:  Let's focus right now on 505 and 506."

Ultimately, the trial court gave CALCRIM No. 505 (Justifiable Homicide: Self-Defense or Defense of Another) and No. 3477 (Presumption That Resident Was Reasonably Afraid of Death or Great Bodily Injury).

CALCRIM No. 3475 would have stated:

"The (owner/lawful occupant) of a (home/property) may request that a trespasser leave the (home/property). If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to (the (home/property)/ [or] the (owner/ [or] occupants), the (owner/lawful occupant) may use reasonable force to make the trespasser leave.

"Reasonable force means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave.

"[If the trespasser resists, the (owner/lawful occupant) may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property.]

"When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

7

"The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable. If the People have not met this burden, you must find the defendant not guilty of [murder]."

B.    *Analysis.*

"'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.] That duty extends to '"instructions on the defendant's theory of the case, including instructions 'as to defenses "'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"'"' [Citation.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 996.)

"Defense of habitation applies where the defendant uses reasonable force to exclude someone he or she reasonably believes is trespassing in, or about to trespass in, his or her home. However, the intentional use of deadly force merely to protect property is never reasonable. Accordingly, a homicide involving the *intentional* use of deadly force can never be justified by defense of habitation alone. The defendant must also show either self-defense or defense of others, i.e., that he or she reasonably believed the intruder intended to kill or inflict serious injury on someone in the home. [Citations.]" (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360 [Fourth Dist., Div. Two].)

Here, the fact that defendant used deadly force disqualified him from claiming defense of habitation. The jury was fully instructed on self-defense and defense of

8

others.  If it found that defendant reasonably believed the victim was about to kill (or inflict great bodily injury on) someone in the home, it should have acquitted him.  If, on the other hand, it did not find this, the fact that defendant was acting in defense of habitation was irrelevant.  As defendant concedes, "the defense of habitation alone cannot justify [his] subsequent intentional shooting of Locke . . . ."

Defendant argues, "A jury could have found that even if appellant . . . acted reasonably when he actually pulled the trigger and shot Locke, it was not reasonable for him to have brandished a firearm in the first place."  Defendant, however, was not charged with brandishing.  (Pen. Code, § 417.)  We cannot imagine by what mental contortions the jury could conclude that it was reasonable to fire the gun but not reasonable to pull out, hold, or display the gun.  In any event, the jury was fully instructed that, as long as defendant was acting reasonably when he pulled the trigger, he should be acquitted.

Accordingly, the trial court did not err by failing to give CALCRIM No. 3475.

III

PROSECUTORIAL MISCONDUCT

Defendant contends the prosecutor committed misconduct by continuing to ask questions calling for hearsay after the trial court had already sustained hearsay objections.

9

A.    *Additional Factual and Procedural Background.*

1.    *Questions calling for out-of-court statements to Tesone.*

During the prosecutor's direct examination of Investigator Terry Tesone, she

asked him about his efforts to locate Gabaldon and Gilbert.  In the course of doing so, she

asked him at least 17 questions about out-of-court statements by various people.  Each

time, defense counsel objected on hearsay grounds, and each time, the trial court either

sustained the objection or limited Tesone to answering "yes" or "no."

Eventually, the trial court admonished the prosecutor, "Counsel, stay away from

hearsay."  Nevertheless, she soon asked:

"Q.  BY [THE PROSECUTOR]:  On June 21st of 2013, did you learn that David

Gilbert got an attorney by the name of Michael DeFrank?

"A.  Yes.

"Q.  And at that point, were you advised to stop —

"[DEFENSE COUNSEL]:  Objection, your Honor.  Hearsay.

"Q.  BY [THE PROSECUTOR]:  — investigating?

"THE COURT:  Sustained."

At a sidebar conference, defense counsel complained:  " . . . I don't know how

many times I objected and the Court sustained my objections relative to hearsay.  And I

think counsel continued, in spite of the court's rulings regarding hearsay.  These are

pretty basic.  She continued to ask for hearsay from the witness on the stand.  And it

forces the [d]efense into a position of objecting, objecting, objecting, objecting before the

10

jury.  And it makes us look like we're trying to hide something here."  However, the only relief he requested was a ruling preventing the prosecutor from asking what Gilbert's attorney had told Tesone.

The prosecutor argued that what Gilbert's attorney told Tesone (i.e., that Gilbert would not give a statement) was relevant for the nonhearsay purpose of explaining why Tesone did not keep trying to find Gilbert.  The trial court nevertheless precluded the prosecutor from asking about what Gilbert's attorney said, because it appeared to be an invocation of the Fifth Amendment privilege.

### 2.    *Instruction to disregard Tesone's testimony.*

The next day, defense counsel proposed to call a defense investigator to testify about his efforts to locate Gabaldon and Gilbert.  The trial court opined not only that the proffered evidence was irrelevant, but also that Tesone's testimony had been irrelevant. Defense counsel asked the court to instruct the jury to disregard Tesone's testimony.  The trial court agreed to do so.

Accordingly, it told the jury:  "[T]he Court will now admonish the jury to disregard the testimony of the witness, Terry Tesone, who testified yesterday.  Disregard that testimony completely as if you had never heard of it."

### 3.    *Motion for new trial.*

When defendant filed a motion for new trial, he argued (among other things) that the prosecutor had committed misconduct by continuing to ask questions that called for

11

hearsay even after the trial court had sustained hearsay objections.  The trial court denied the motion.

B.  *Analysis.*

"""When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated."'  [Citations.]  '"Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." [Citation.]'  [Citation.]  Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected.  [Citations.]"  (*People v. Shazier* (2014) 60 Cal.4th 109, 127.)

"'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.'  [Citation.]"  (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order.  [Citation.] . . .  A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.  [Citation.]  Also, a claim of prosecutorial

12

misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Here, defense counsel objected exclusively on hearsay grounds; he did not object based on prosecutorial misconduct. Moreover, when the asserted misconduct occurred, he did not request an admonition. Belatedly, he did ask the court to admonish the jury to disregard Tesone's testimony; however, the trial court did so. Thus, it granted all the relief he requested. Defense counsel forfeited any claim that that admonition was inadequate to cure any prejudice.

If a claim of prosecutorial misconduct was not raised when the misconduct occurred, it cannot be raised in a motion for new trial. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1252-1253.) "It is well established that if at any time during trial a party or his counsel becomes aware of facts constituting misconduct or irregularity in the proceedings of the jury he must promptly bring such matters to the attention of the court, if he desires to make an objection or he will be deemed to have waived the point as a ground for a new trial. [Citation.]" (*People v. Adame* (1973) 36 Cal.App.3d 402, 409-410.)

Separately and alternatively, it does not appear that the asserted misconduct[2] was prejudicial. Defense counsel expressed concern that, from the fact that he had to object

_____

[2] The People argue, as the prosecutor did below, that the proffered evidence was relevant for a nonhearsay purpose and therefore the trial court erred by sustaining

*[footnote continued on next page]*

13

so often, the jury might think he was hiding something. However, it was more likely that, from the fact that all of his objections were sustained, the jury would think the prosecutor was asking improper questions. In any event, the trial court ordered the jury to "[d]isregard [Tesone's] testimony completely as if you had never heard of it." We see no reason why it could not follow that admonition. Hence, we presume that the jury did so. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 292.)

Defendant argues that the jury would have inferred that the testimony of missing witnesses Gabaldon and Gilbert would have favored the prosecution. This has it exactly backwards. By calling Tesone, the prosecutor was trying to show that she had exercised due diligence to secure their appearance, and perhaps also that their testimony would have helped the prosecution. To some extent, that testimony (if relevant at all) was not even arguably hearsay. For example, Tesone was able to testify that he contacted certain people, and that he failed to obtain any leads from them. However, when (1) the prosecutor asked questions about out-of-court statements to Tesone, (2) defense counsel

---

*[footnote continued from previous page]*
defense counsel's objections. Even if so, however, the prosecutor was not free to disregard the trial court's rulings. While we have found no authority dealing specifically with prosecutorial misconduct, it is well-established that there is a duty to comply with even an erroneous order; thus, the violation of an erroneous order can be punished as contempt. (*Signal Oil etc. Co. v. Ashland Oil Co.* (1958) 49 Cal.2d 764, 776.)

If the prosecutor had a good-faith belief that her questions did not call for hearsay, at a minimum, she should have requested a sidebar so she could make that argument to the trial court. She did not. Instead, she just plowed ahead.

14

objected, and (3) the trial court sustained the objection, it did not help the prosecution at all.  Nor did the fact that the prosecutor persisted in asking such questions.

We therefore conclude that the asserted prosecutorial misconduct did not rise to the level of reversible error.

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

KING
J.

15