Filed 6/22/16  P. v. Soto CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>JORGE ANTONIO SOTO,<br><br>　　Defendant and Appellant. | D068278<br><br><br>(Super. Ct. No. SCE340911) |

APPEAL from a judgment of the Superior Court of San Diego County, Lantz Lewis, Judge.  Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Meagan J. Beale and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jorge Antonio Soto[1] of the attempted murder of Arnulfo Ramirez (count 1: Pen. Code,[2] §§ 664, 187, subd. (a)) and found true the allegations that Soto personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)) and personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)). The jury also convicted Soto of brandishing a deadly weapon, a knife (count 4: § 417, subd. (a)(1)) against Pedro Aguilar. The court sentenced Soto to 19 years in state prison.

Soto appeals, contending his attempted murder conviction should be reversed because the prosecutor told a story about Robert Downing, Jr.'s burglary trial in closing argument that lowered the prosecution's burden of proof for specific intent on the attempted murder charge, prejudicing Soto. We affirm the judgment.

FACTUAL BACKGROUND

A. *The People's Case*

In June of 2014, around 3:00 p.m., Soto got into an argument with his mother over money and became enraged, loudly cursing at her and throwing a pan of rice into the backyard. When Soto left the kitchen to throw the pan, his mother locked the door

---

[1] We note there are inconsistencies in the record as to defendant's true name. The complaint and first amended information identify defendant as "George Anthony Ray aka Jorge Antonio Soto." On February 24, 2015, the trial court deemed defendant's true name to be "Jorge Soto." However, defendant is referred to thereafter as "George Ray" in the body of the verdict forms, with the captions stating "George Ray, AKA Jorge Soto." Defendant is also referred to as "George Ray" in the pronouncement of judgment and supplemental pronouncement of judgment dated May 27, 2015. In addition, the abstract of judgment references "George Anthony Ray" with a true name of "Jorge Antonio Soto, Jorge Andrew Soto, et al." We will refer to the defendant as Jorge Antonio Soto.

[2] Undesignated statutory references are to the Penal Code.

2

behind him and called the police. She described Soto as "out of control" and "very irritated." She explained to the 911 operator that Soto needed some help, had a history of using drugs and was "all messed up," but she did not know if he was drinking or using that day because she had just arrived home. Soto's mother further told the 911 operator that Soto sometimes carries a pocketknife, but she did not know if he had it with him.

Nearby, Aguilar and Ramirez were preparing to leave their landscaping job for the day. The men did not know Soto. Soto walked toward Aguilar holding a knife, making stabbing motions and saying something like "what are you looking at." Aguilar was scared and ran backwards toward his car. Aguilar described Soto as having a "crazed look."

Soto then approached Ramirez with the knife, holding it low behind his hip. Ramirez did not realize Soto had a knife until Soto stabbed him in the left shoulder. Ramirez tried to run, but only got about 20 to 25 feet before he stumbled and fell, landing on his back. Soto chased after Ramirez. Ramirez tried to kick at Soto to protect himself, but Soto got on top of him, straddling Ramirez's body, stabbing toward Ramirez's head and neck several times and saying "fuck you" while he attacked. Ramirez jerked his head from side to side to avoid the knife strikes, and grabbed Soto's hand holding the knife. Ramirez believes that if he had let go of Soto's hand Soto would have killed him. Soto attempted to get Ramirez to release his knife hand, using his other hand to poke at Ramirez's eyes and grab his mouth and nose. Soto saw people begin gather and abruptly left the area, walking rapidly.

3

In addition to a stab wound to his left shoulder, Soto had stabbed Ramirez in the right hand, severing a tendon, in the right forearm and several times in the head, requiring staples. Ramirez was too weak to get up without assistance and was taken by ambulance to the hospital, where he spent four days. It took Ramirez three months to recover from the attack. More than 10 months after the incident, Ramirez remains scarred, is unable to sleep well on one side, continues to have pain in his hand and still has numbness in the pinky finger and is unable to move it. Ramirez thought Soto may have been "drugged" on the day of the incident because of the way Soto attacked him and because Soto was spitting on him during the attack.

Around the time of the attack, a witness called 911 and reported seeing a man with a big knife wearing a bloody shirt and walking pretty fast. Another witness called 911 around 3:30 p.m., when she saw a man who appeared bloody, with tattoos on his arms, throw a shirt in a trash can. A sheriff's deputy responded to the call and collected the shirt. A third witness called 911 at around 5:55 p.m., reporting seeing a "very irate" shirtless man pacing in the street, yelling and talking to himself. The witness further saw the man urinating and stated that he had left the fly open on his pants. The witness believed the man was under the influence of drugs or alcohol because of his aggressiveness ("he looked angry") and the way he was pacing. She observed him go into a house with two flags in front. Soto's house was the only house on the street with two flags in front.

Soto eventually returned to his house, hugged his father, kissed him on the cheek and said "good-bye" and "I love you." A sheriff's deputy went to Soto's house in

4

response to the 5:55 p.m. call and spoke with Soto's mother, who stated Soto had said he was going to Tijuana and that she had seen Soto in the front yard cleaning a knife in the grass, wiping both sides of the blade. While at Soto's residence, a deputy collected a swab of blood from a rear door.

Around 6:50 p.m., another witness called 911 to say he had seen a shirtless male, covered in tattoos, holding a butcher knife. Shortly thereafter, Soto was located and taken into custody on a nearby street, shirtless, covered in tattoos and with cuts on both hands and blood on his right hand. Soto verbally identified himself as Jorge Soto to law enforcement personnel and did not resist arrest. A detective saw Soto throw a knife to the side of the road shortly before his arrest. The knife, a pocketknife, was found in a closed position.

Following his arrest, Soto appeared to be under the influence of alcohol or drugs as he was slightly incoherent at times and verbally confrontational. However, Soto was able to understand, and comply with, instructions. While in the holding cell, Soto requested to have his handcuffs removed so he could use the bathroom and then dropped his pants to his ankles and proceeded to urinate. Soto was not tested for alcohol or drugs.

After Soto was taken into custody, a deputy interviewed potential witnesses in the immediate area and one man told the deputy that Soto had asked him for a shirt, stating that the cops were after him. The bloody shirt found in the trash was tested for DNA and DNA from the left and right arms matched Ramirez's DNA profile, while DNA taken from inside the collar was a mixture of DNA from Ramirez and Soto. The blood found on a rear door at Soto's home was also tested and matched Soto's DNA profile. The knife

5

that Soto discarded was tested and no blood was found on the blade, but the knife tested positive for blood in a tiny area inside the handle and DNA obtained from that area matched Soto's DNA.

### B. *The Defense's Case*

The only disputed issue in the case was Soto's intent at the time of the assault. The defense called Soto's father's caretaker as a witness. The caretaker was at Soto's home on the afternoon of June 2, 2014, and observed Soto yelling and cursing at his mother after Soto asked her for money and she would not lend him any. She also saw Soto's mother follow him into the kitchen after hearing a "thump" when Soto threw a pan of rice outside. Soto appeared angry and upset, and the caretaker had never seen him so agitated. The caretaker was concerned that Soto might harm his parents and convinced Soto's mother to call 911. She did not see Soto return home later that day. On cross-examination, the caretaker admitted she had only worked for Soto's family for a few months prior to the incident.

## DISCUSSION

On appeal, Soto contends that the prosecutor's use of an analogy to explain the defense of voluntary intoxication, as applied to the element of intent, caused jury confusion and prejudiced Soto. We conclude Soto has failed to meet his burden of demonstrating that the prosecutor's description confused the jury and prejudiced Soto. Accordingly, we affirm the judgment.

6

*A.  Background*

Prior to opening statements, the court instructed the jury under CALCRIM No. 222 that "[n]othing the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys will discuss the case and tell you what they think the evidence is showing.  These remarks by attorneys are not evidence."

Following the presentation of evidence and before closing arguments, the court instructed the jury under CALCRIM No. 200 that "[y]ou must follow the law as I explain it to you even if you disagree with it.  If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  The court further instructed the jury under CALCRIM Nos. 252 and 3426 that "to find a person guilty of [attempted murder], that person must not only intentionally commit the prohibited act but must do so with a specific intent.  The specific intent required for the crime of attempted murder is the intent to kill.  You may consider evidence, if any, of voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with the specific intent to kill, an element of the crime charged for attempted murder."

The court also provided the jury with written copies of each of the instructions for review in the jury room.  Soto does not contend there was any error in the jury instruction.

1. *Prosecutor's analogy regarding voluntary intoxication*

In the prosecutor's rebuttal closing argument, she addressed voluntary intoxication through an analogy as follows:

> "Ladies and gentlemen, one of the big things defense counsel argued and what she is trying to hang her hat on is the fact that many witnesses, basically all of the them, said he looked high or drunk. He looked under the influence. Just because you're high or drunk or under the influence of a drug or alcohol doesn't mean that automatically takes away your ability to form an intent to kill. I would like to tell you a story.
>
> "We have this crime and it is called burglary. For a burglary, you have to enter someone's house with a certain intent; and that's the intent to commit a felony within or to commit a theft. I don't know if anyone remembers, but many, many years ago Robert Downey, Jr. was arrested for trespassing because Robert Downey, Jr. got very, very high. He was very much intoxicated and under the influence. And he went into his neighbor's house thinking it was his own house, lied [*sic*] down in a small child's bed, and passed out. He was so intoxicated, so high, so drunk that he thought it was his house. He went in. He went to sleep.
>
> "He didn't go in intending to commit a felony. He didn't go in intending to commit a theft. Ladies and gentlemen, in this case the defendant was not so intoxicated that he didn't know what he was doing. Because that's the purpose of involuntary [*sic*] intoxication: we're not going to hold him accountable for something; that they are so drunk, so high, they have no idea what they are doing."

After the prosecutor completed her rebuttal closing argument, Soto's counsel requested a sidebar conference and asked the court to instruct the jury not to consider the prosecutor's analogy involving Robert Downey, Jr., because it "trivialized the specific intent to kill" for the attempted murder count. The court denied the request.

8

2. *Verdicts*

As previously noted, the jury found Soto guilty of attempted murder of Ramirez and found true the allegations that Soto inflicted great bodily injury on Ramirez using a deadly weapon. The jury also convicted Soto of brandishing a deadly weapon against Aguilar.

*B. Analysis*

1. There was no prosecutorial error

On appeal, Soto contends the prosecutor used an analogy regarding Robert Downey, Jr. during her rebuttal argument "to suggest that a person must be unconscious or pass out in order for voluntary intoxication to negate the required intent," therefore the prosecutor's description of voluntary intoxication lowered the burden of proof as to specific intent to kill because it "muddied the waters for jurors," prejudicing Soto. We disagree.

As a threshold matter, we find no prosecutorial error here. The Supreme Court has summarized the legal standard for evaluating prosecutorial error or misconduct as follows: "'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.' [Citations.] '"Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." [Citation.]' Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial

9

outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127 (*Shazier*).) "'"'To prevail on a claim of prosecutorial misconduct based on remarks to the jury,'"' there must appear '"'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'"'" (*Ibid.*)

On appeal, Soto admits that "'"'a prosecutor is given wide latitude during argument,'"'" and "'"'may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.'"'" (*People v. Hill* (1998) 17 Cal.4th 800, 819, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) In Soto's case, the prosecutor used a familiar story to illustrate voluntary intoxication resulting in a defendant's failure to form intent. She did not argue that a defendant must be "unconscious" or "sleep-walking" not to have intent, but merely contrasted Robert Downey, Jr.'s lack of understanding of his actions with Soto's series of conscious choices which she argued established Soto's intent. The prosecutor's story involved a different crime and different intent, which she explained. Although the prosecutor did point out twice that Soto was not "stumbling," potentially implying that stumbling was required to establish severe intoxication, she did not argue that stumbling was required, and the extent of a defendant's unsteadiness or abnormal gait is frequently used to characterize levels of intoxication. (See, e.g., *People v. Kaurish* (1990) 52 Cal.3d 648, 696 [no voluntary intoxication instruction was required when defendant "was capable of holding a normal conversation, and did not walk irregularly when he left the party"]; *People v. Hughes* (2002) 27 Cal.4th 287, 317 [defendant characterized as "slightly intoxicated but not

'drunk,' " when he had "glassy eyes" and "although somewhat unsteady, did not have trouble standing"].)

Under these facts, the prosecutor's challenged conduct was not "egregious" and did not involve the "use of deceptive or reprehensible methods" so as to constitute prosecutorial misconduct under either the federal or state standard. (*Shazier*, *supra,* 60 Cal.4th at p. 127.)

2. There is no evidence of jury confusion

Moreover, we do not find anything here to suggest that the jury understood or applied the prosecutor's comments in an incorrect manner. There was no evidence of jury confusion and the jury was instructed with the correct standard by the court and heard the evidence and arguments of both parties on the issue. It is presumed "that jurors understand and follow their instructions [citation] and do not draw the most damaging inferences from ambiguous arguments." (*Shazier, supra,* 60 Cal.4th at p. 150.)

3. Soto has failed to demonstrate prejudice

In any event, even if Soto had shown possible jury confusion, he has failed to demonstrate prejudice. Soto contends that under *People v. Watson* (1956) 46 Cal.2d 818, 836, we must reverse because "there is a reasonable chance of a more favorable verdict had the trial court admonished jurors that voluntary intoxication does not require unconsciousness or a total unawareness of one's actions or surroundings."

However, "the *Watson* test for harmless error 'focuses not on what a reasonable jury *could do*, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other

11

things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)  Following our review of the record, we conclude it is not reasonably likely that the jury's findings were based on any misunderstanding regarding the standard for voluntary intoxication and specific intent in light of the overwhelming evidence of Soto's purposeful actions relating to his attack on Ramirez.

"Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."  (§ 29.4, subd. (c).)  "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent." (§ 29.4, subd. (b).)  The intent required for Soto's attempted murder charge is a specific intent to kill.  (*People v. Lee* (1987) 43 Cal.3d 666, 670 ["[A] specific intent to kill is a requisite element of attempted murder."].)   "'[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime.'"  (*People v. Avila* (2009) 46 Cal.4th 680, 701.)  Based on the evidence presented in Soto's trial, there are ample facts from which to infer specific intent, even assuming some level of intoxication.

The impetus for Soto's attack on Ramirez appears to have been Soto's rage stemming from his mother's refusal to give him money.  A defendant's tendency "to act in anger or on impulse without reflecting upon the possible consequences, particularly when

12

intoxicated" is not inconsistent with forming specific intent.  (*People v. Jones* (2012) 54 Cal.4th 1, 67; see *People v. Isby* (1947) 30 Cal.2d 879, 890 [voluntary intoxication no excuse even if "defendants' passions were aroused by the liquor which they voluntarily drank and that they were in a quarrelsome mood at the time of [the killing]".)  The extent to which Soto's actions are attributable to his anger rather than from any intoxication weighs against a voluntary intoxication defense.  (*People v. Lopez* (1992) 11 Cal.App.4th 1115, 1123-1124 [no error in failing to instruct on voluntary intoxication when testimony established defendant's actions resulted from anger, not intoxication and no expert testimony was presented regarding the impact of the drug defendant claimed to have ingested].)  Moreover, while Soto was extremely angry, he had the presence of mind to redirect his anger away from his mother—first to a pan of rice and then to a stranger—rather than harming someone he presumably loves.

Once outside, Soto made a decision not to attack Aguilar, who fled to his car after Soto brandished his knife.  Instead, Soto hid his knife behind his hip and attacked Ramirez.  Soto was not satisfied with merely taking Ramirez off-guard and stabbing him in the left shoulder, but chose to chase after Ramirez, restrain him and make multiple attempts to stab Ramirez's face, head and neck.  In evaluating an attempted murder charge against a defendant who repeatedly attempted to stab "an unarmed and trapped victim, and succeeded in stabbing him in the arm and leg" (*People v. Avila, supra,* 46 Cal.4th at p. 701), the Supreme Court found that "[t]his evidence alone is substantial evidence of defendant's intent to kill (*id.* at pp. 701-702)."

13

Soto's targeting of Ramirez's head and neck is also significant. The neck area is extremely vulnerable to a lethal stab wound. Evidence that an attacker targets a vulnerable area is further evidence of intent to kill. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1293 ["act of slashing [victim's] throat 'is indicative of a reasoned decision to kill' "]; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552 ["a factor indicating a killing is premeditated and deliberate is the existence of 'wounds [which] were not wild and unaimed but were in the area of the chest and heart'"]; *People v. Bolden* (2002) 29 Cal.4th 515, 561 [stating that "[i]n plunging the knife so deeply into such a vital area of the body of an apparently unsuspecting and defenseless victim, defendant could have had no other intent than to kill"].)

Soto argues that the injuries Ramirez sustained were not life-threatening, but "the degree of the resulting injury is not dispositive of defendant's intent." (*People v. Avila*, *supra,* 46 Cal.4th 680 at p. 702.) An attacker's failure to hit vital organs may be "fortuitous rather than indicative of the absence of an intent to kill." (*People v. Gonzalez, supra,* 126 Cal.App.4th at p. 1552, *citing People v. Lashley* (1991) 1 Cal.App.4th 938, 945 [victim's escape from death due to "poor marksmanship" did not establish lack of intent to kill].) It is clear that Ramirez fought vigorously and believed that Soto would have killed him absent Ramirez's resistance. The fact that Ramirez survived is not proof that Soto was not trying to kill him.

In addition, Soto's actions following the stabbing confirm that he was sufficiently lucid to experience guilt. Soto stopped stabbing Ramirez and quickly left the scene when people began to gather and later said good-bye and informed his parents that he planned

14

to leave for Tijuana. Soto also cleaned the knife he used so thoroughly that no trace of blood remained on the blade, threw away his bloody shirt and requested a new shirt from a neighbor because "the cops were after him." Such attempts to leave the scene and conceal the evidence of his crimes tend to show a consciousness of guilt. (*People v. Hoang* (2006) 145 Cal.App.4th 264, 276 [finding "an inference of consciousness of guilt on defendant's part," was warranted when "[d]efendant left the scene of the crime immediately after [the victim's] stabbing, quickly and in silence"]; *People v. Tate* (2010) 49 Cal.4th 635, 698 [attempt to conceal evidence by throwing away bloody socks and washing clothes]; *People v. Randle* (1992) 8 Cal.App.4th 1023, 1036-1037 [noting defendant's attempts to change his appearance].) Although Soto's consciousness of guilt does not establish his intent to kill, it does show that Soto was capable of deliberate thought around the time of the attack and exhibited awareness of the potential repercussions of his actions.

Soto argues that the evidence of Soto's "bizarre and crazy behavior was likely a result of him being under the influence of drugs or alcohol" and therefore "there is a reasonable chance of a more favorable verdict had the prosecutor not used the Robert Downey, Jr. analogy." However, Soto's behavior, while evidencing some degree of intoxication, was not sufficient to establish that his capacity was so impaired as to negate the required criminal intent. For example, evidence that a defendant had been drinking heavily, "had gone virtually without sleep for approximately 24 hours" (*People v. Marshall* (1996) 13 Cal.4th 799, 848), had a blood alcohol content of 0.10 three hours after his arrest and who appeared "dazed," "in a state of shock" and not "in a normal

15

behavior" (*id.* at p. 847) to police was held by the Supreme Court to "fall[] short of a reasonable basis for concluding defendant's capacity to entertain the mental state required for murder was diminished." (*Id.* at p. 848.) Likewise, "a rational jury could conclude beyond a reasonable doubt defendant's intoxication on the night of the murders did not negate his intent to kill" (*People v. Cain* (1995) 10 Cal.4th 1, 40), when evidence showed only that "[d]efendant smoked an unspecified quantity of cocaine and may have consumed an unspecified quantity of beer and marijuana [and he] looked 'sprung' and exhibited the following symptoms of cocaine usage: 'talks fast, repeats things, and you try and tell them something and it doesn't—they don't seem to hear it.'" (*Ibid.*, italics omitted.) Similarly, evidence was insufficient to even require an instruction of voluntary intoxication when testimony was "reducible to statements to the effect that defendant was 'acting like he was on LSD' and was 'acting crazy,' i.e., 'making facial expressions, being kind of jumpy[,] . . . [changing] the tone of his voice.'" (*People v. Williams* (1988) 45 Cal.3d 1268, 1311, abrogated on another ground by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190, disapproved in part on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 560–561.) Accordingly, although the evidence did show that Soto may have been intoxicated, it did not establish that his intoxication was sufficiently severe so as to negate his specific intent.

For all of the foregoing reasons, we affirm the judgment.

16

DISPOSITION

The judgment is affirmed.


NARES, Acting P. J.

WE CONCUR:


McDONALD, J.


AARON, J.

17